Grafton,
March 1, 1910.

## WILLIS, Adm'r, v. PLYMOUTH & CAMPTON TELEPHONE EXCHANGE CO.

The only duty a master owes to experienced servants in respect to instrumentalities is that of giving all information necessary to a full appreciation of the peculiar danger arising from their abnormal or defective condition, of which he knows or might know by the exercise of ordinary care and concerning which they are justfiably ignorant.

Where an injury to a servant employed to make repairs is attributable to the master's failure to maintain his instrumentalities in a normal condition, the latter is liable therefor if the unusual risk was known to him and unknown to the servant.

The fact that a servant would have escaped injury if he had made use of suitable tools provided by the master is not alone sufficient to defeat an action against the latter, if the evidence warrants a finding that the servant was not instructed to use the appliances and was not chargeable with knowledge that they should be utilized in the work he was directed to perform.

The fact that a servant's failure to follow instructions contributed to cause his injury does not conclude his right to recover against the master, if there is evidence of an habitual disregard of instructions by other workmen and by the superior from whom such orders were received.

CASE, for negligently causing the death of Frank B. Willis, the plaintiff's intestate. Trial by jury and verdict for the plaintiff. Transferred from the May term, 1908, of the superior court by *Stone, J.*, on the defendants' exceptions to the denial of their motion for a nonsuit and to the refusal of the court to give requested instructions.

The plaintiff's evidence tended to prove that Frank B. Willis had worked for the defendants about one year at the time he was killed. He was employed as a lineman, and had a little experience as such before entering the defendants' employ. It was a part of his work to straighten leaning poles. He was told that when doing such work he must inspect the poles for himself, that he was not to climb a pole unless he knew it was safe to do so, and was not to climb one that leaned badly without using a guy rope. The defendants' employees, including the man who gave Willis these instructions, were in the habit of climbing leaning poles without using a guy rope whenever they thought it safe to do so. Willis was a very careful man, and was accustomed to implicitly obey instructions as he understood them.

Two or three days before Willis was killed, the defendants' superintendent noticed that an angle-pole in one of their lines was leaning. The side strain of the wires on such a pole has a tendency to pull the top over. To counteract this tendency, such poles are set four feet in the ground and are supported by a brace, or a guy, or both. When such a pole is supported by a short brace, the side strain of the wires has a tendency to lift it out of the ground. If this happens after the pole has been set for some time, it is easily discernible, as the earth stain will show above the surface of the ground; but if a pole is pulled up soon after it has been set, an earth stain is not apparent. None of the tests in use by the defendants to determine whether or not it is safe to climb a pole is available in the case of a leaning angle-pole supported by a brace. The pole in question was at one time supported by a guy, but at the time Willis was injured it was provided with a brace.

When the superintendent saw the pole, he noticed that the brace was too short and thought the pole leaned because the side strain of the wires had pulled it partly out of the ground; but he did nothing to ascertain whether that was the fact, nor did he tell Willis what he thought when he sent him to straighten the pole, or give him any special instructions as to how the work should be done. He merely directed Willis and two others to take a new brace and straighten up the pole, placing Willis in charge of the work. When they arrived at the pole they found no surface indications that it was not set at the usual depth in the ground, nor was there anything abnormal in its appearance, except that it leaned slightly. Willis told one of his companions to remove the earth from the side of the pole opposite to the direction in which it leaned, while he climbed the pole for the purpose of placing the new guy. When he reached the cross-arms and leaned out over them, his weight, added to the side strain of the wires, lifted the pole free from the ground. Willis dropped and the pole fell upon him, killing him instantly.

Although the attention of Willis had been directed to angle-poles which had been pulled wholly or partly out of the ground by side strain of the wires, he had never seen a pole so displaced without some surface indications of what had happened; and it did not appear that he had ever been informed that such a thing might occur. The pole in question was buried in the ground for only two and a half feet of its length. Willis thought it was set at the usual depth; and if it had been, it would have been perfectly safe for him to act as he did.

*Ira A. Chase* and *Branch & Branch* (*Oliver W. Branch* orally), for the plaintiff.

*Alvin F. Wentworth* and *Streeter & Hollis* (*Fred C. Demond* orally), for the defendants.

YOUNG, J. 1. The defendants' contention that their motion for a nonsuit should have been granted is based on the proposition that a master owes the servants he employs to repair his instrumentalities no duty of inspection. Is this an accurate statement of the rule to be applied in this case to determine the rights and duties of the parties?

In this jurisdiction, in so far as instrumentalities are concerned, the only duty the law imposes on the master for the benefit of experienced servants is that of notifying them of the dangers peculiar to the service because of any abnormal or unusal condition of his instrumentalities, of which he either knows or would have known if he had used ordinary care for their safety, and of which they neither know nor are in fault for not knowing; intending by "notifying," not merely calling their attention to the peculiar physical condition of his instrumentalities, but giving them all the information necessary to enable them to appreciate fully the dangers peculiar to the service because of any abnormal or defective condition of his instrumentalities.

Since a master performs his full duty, in so far as experienced servants are concerned, when he notifies them of the extraordinary or abnormal dangers of the service, it is true that he owes servants employed to make repairs no duty to notify them of the dangers of the service which are not caused by some unusual or abnormal condition of the instrumentalites to be repaired; for risks not created in that way are the usual or ordinary dangers of the service, and as to such risks the master owes his servants no duty, no matter what they are employed to do. But when, as in this case, the dangers incident to making the repairs arise from the master's failure to maintain his instrumentalities in the usual or ordinary way, he is in fault as to servants injured while making repairs, if he did and they did not know of the abnormal risk caused by the unusual condition of his instrumentalities (*Aldrich* v. *Railroad.* 67 N. H. 380); for such risks are not the usual or ordinary hazards of the service, but are among the extraordinary or unusual risks, of which it is the duty of the master to notify his servants when he does and they do not appreciate the peculiar dangers of the service incident thereto.

Although the defendants owed the intestate no duty to notify him of the dangers ordinarily incident to straightening up poles the usual depth in the ground, still it was their duty to do whatever the ordinary man would have done for his safety. It is not intended by this that it was the defendants' duty to furnish the

intestate with poles safe for him to climb, or even with poles maintained four feet in the ground; but it was their duty to do what the ordinary man would have done to ascertain whether their poles were originally set the proper depth in the ground, or whether they had been pulled up since they were set. It is not, therefore, an accurate statement of the master's duty to say that he owes the servants he employs to make repairs no duty of inspection. He owes such servants, as well as those whom he employs to use his instrumentalities, the duty of doing whatever the ordinary man would do to discover the abnormal or extraordinary dangers of the service, and to notify them of those dangers of which he does and they do not know. Since this was the defendants' duty, the test to determine whether they were in fault for the intestate's death is to inquire whether (1) they did, and (2) he did not, know that the pole in question was less than the usual depth in the ground, and fully appreciate the risk peculiar to the work of straightening it up because of this fact; if it is found that they did and he did not appreciate that risk, (3) whether the fact the pole was in the ground but two and one half feet was an abnormal condition; and if it was, (4) whether they used ordinary care to notify him of the dangers peculiar to the service because of it. Wood M. & S., ss. 414, 415.

The defendants' manager thought the pole leaned because the wires had pulled it out of the ground. It can be found from the testimony in respect to the intestate's habit never to climb a pole, or to permit others to climb it, unless he thought it was safe to do so, that he did not know the pole had been pulled up, or in any event did not appreciate the risk incident thereto. It is conceded that the pole ought to have been at least four feet in the ground; consequently the only question to be considered on this branch of the case is whether it can be said that the defendants did all the ordinary man would have done to notify the intestate of the danger peculiar to his work because the pole was less than the usual depth in the ground. All they did for that purpose was to tell him to use a guy rope if the pole leaned badly. As the defendants' servants were in the habit of construing that instruction, it meant that he was to use a guy rope whenever he thought, all things considered, it was not safe to climb a pole without it. But if it is conceded that the intestate understood it was not safe to climb any pole that leaned badly without using a rope, it can still be found that the defendants did nothing to notify him of the danger they knew was peculiar to climbing this pole, for it can be found that this pole did not lean badly. In short, it can be found that they sent him out to do this work without giving him any information whatever in respect to the

extraordinary danger incident thereto, although they either knew or ought to have known of it, and also knew or ought to have known that there was no ground stain or other surface indication to show that the pole was less than the usual depth in the ground, and that in that situation a man of the intestate's experience would be as likely to attribute the leaning of the pole to the fact that the brace had sunk into the soft sand, as to the fact that the wires had pulled the pole out of the ground. It cannot be said that under these circumstances the ordinary man would not have done something more than the defendants did to notify the intestate of the abnormal danger incident to straightening up this pole.

2. Concede that the defendants' first request should not have been refused because it assumed that the intestate was instructed to inspect poles for himself and not to climb one that leaned badly without using a guy rope, and it does not follow that the court erred in refusing it. As has been seen, it is not an accurate statement of the law as applied to the facts of this case to say that the defendants were under no duty to the intestate " to inspect the pole in question." It was their duty to do what the ordinary man would have done to ascertain whether this pole was originally set at the usual depth, or whether since then the wires had pulled it up; and if they found either that it was not set at the usual depth, or that it had been pulled out of the ground, to notify the intestate of it.

3. The defendants' second request was also properly refused. It cannot be said, as a matter of law, that if the defendants furnished the intestate " with suitable tools and apparatus with which to do his work and Willis failed to use them, and if this failure in any way contributed to the accident, the plaintiff is not entitled to recover." If it is conceded that the defendants provided the guy rope for use on this pole, and that it was a suitable rope for that purpose and would have prevented the accident, the plaintiff could still recover if they failed to tell the intestate to use it, and he did not know and was not in fault for not knowing that he ought to use it. In that case, the fact that the rope would have prevented the accident is simply immaterial to the issue of the plaintiff's right to recover.

4. Neither can the defendants complain because the court refused to instruct the jury that if the intestate " failed to follow the instructions which were given him, and if the accident was in any way caused by his failure to follow them, the plaintiff is not entitled to recover."

*Exceptions overruled.*

All concurred.

The foregoing opinion was filed October 5, 1909. The defendants having moved for a rehearing, further argument in writing was invited upon the exception to the refusal to give the following instruction to the jury: "If Willis failed to follow the instructions which were given him, and if the accident was in any way caused by his failure to follow instructions, then the plaintiff is not entitled to recover."

*Alvin F. Wentworth* and *Streeter & Hollis*, for the motion.

*Branch & Branch*, opposed.

PEASLEE, J. The question concerning the refusal to give the third instruction requested by the defendant has been argued as though it referred only to one express, unequivocal order given for this particular piece of work. If the request had been so framed as to relate to this order and this alone, there might be force in the arguments advanced. But the request is broader than that. It includes all instructions ever given Willis, and demands a verdict for the defendant if failure to follow any of these instructions in any way caused the accident.

There was evidence not only of the specific instruction for this day's work, but also of general instructions along similar lines. There was also evidence that these general instructions were habitually disregarded, not only by the ordinary workmen, but also by their superior who gave the orders to them. From this it might be found that there was no intention on the part of the master that the instructions should be followed. After he has made a rule or given an instruction, "a practical invitation to violate it may be inferred from habitual usage which is known to him." *McNee* v. *Track Co.*, 170 Mass. 283. Fair-minded men might conclude that the general instructions were to be followed only in cases where there seemed to be occasion to do so. The jury might conclude that no special instruction was given, and that the general ones were properly interpreted as above indicated. If they so found, they might return a verdict for the plaintiff if it seemed that Willis reasonably concluded that this was one of the occasions when the instructions were not to be followed. 1 Labatt M. & S. 514, 945, 961. It was the plaintiff's right to have the case considered upon this theory, as well as upon those more favorable to the defendant. The requested instruction would deprive him of this right, and was properly refused. *Ordway* v. *Sanders*, 58 N. H. 132; *Chase* v. *Chase*, 66 N. H. 588, 592; *Smith* v. *Bank*, 70 N. H. 187, 193; *Smith* v. *Bank*, 72 N. H. 4, 10; *Minot* v. *Railroad*, 74 N. H. 230, 237.

*Rehearing denied.*

All concurred.