Coös, }
Feb. 7, 1911. }

### KINDELLAN *v.* MT. WASHINGTON RAILWAY CO.

In an action for negligence against employers, certain evidence deemed to con-
clusively establish that the injuries complained of resulted from dangers which
the plaintiff knew and appreciated, and the risk of which he assumed as an
incident of his employment.

CASE, for negligence. Trial by jury and verdict for the plaintiff.
Transferred from the April term, 1910, of the superior court by
*Chamberlin,* J.

The defendants' motions for a nonsuit and the direction of a
verdict in their favor were denied, and they excepted. The court
instructed the jury that the plaintiff was not a passenger upon the
defendants' railroad at the time of his injury, and that the count in
the declaration charging them as common carriers of passengers need
not be considered. To this instruction the plaintiff excepted.

*Remick & Hollis (Mr. Hollis* orally), for the plaintiff.

*Drew, Shurtleff & Morris (Mr. Morris* orally), for the defendants.

BINGHAM, J. This action is brought to recover damages for an
injury which the plaintiff received while in the defendants' employ-
ment as a section hand and general helper on the Mount Washington
railway. The principal questions arise on the defendants' motions
for a nonsuit and a verdict. At the time the plaintiff received his
injury he was riding on a slide-board over the defendants' railway
from the summit to the base of Mount Washington, and was run into
by a fellow-employee who was following him on a slide-board.
The plaintiff's contentions are that the defendants were negligent
(1) in permitting the section men to use slide-boards at all, and
(2) in putting the foreman, who he says was incompetent, in charge
of the men if they were to use slide-boards; and that he himself
was in the exercise of due care and did not assume the risk of being
injured.

In *Leazotte* v. *Railroad,* 70 N..H. 5, 6, it is said: "A servant
assumes the risk arising from all the ordinary dangers of his employ-
ment, of which he either knows or might have known by the exercise
of due care; and this includes any risk arising from the negligent
performance of the master's duties, if the servant knows of this

danger and voluntarily remains in the master's employment." In more recent cases this statement of the rule has been modified somewhat, the view being that if the servant knows and appreciates the dangers to be encountered in the conduct of the master's business, arising from the nature or condition of the instrumentalities or the methods employed, as to him it is not negligent for the master to make use of such instrumentalities or methods; that the master owes the servant no duty as to dangers of which he is fully informed, and may perform his duty to the servant as to dangers of which he is ignorant either by fully informing him of them, or by perfecting or dispensing with the instrumentalities or methods from which the dangers arise. *Bouthet* v. *Company*, 75 N. H. 581; *Cooley* v. *Company*, 75 N. H. 529; *Manley* v. *Railway*, 75 N. H. 465; *Willis* v. *Company*, 75 N. H. 453; *Deschene* v. *Company*, 75 N. H. 363; *Kelland* v. *Company*, 75 N. H. 168; *Bennett* v. *Company*, 74 N. H. 400. It matters little which is the correct statement of the legal principle,—whether it is based on assumption of risk or absence of duty,—for the result is the same in either event. If, then, the jury were not warranted in finding that the plaintiff was not fully informed as to the dangers pertaining to the use of slide-boards, the defendants were not guilty of a breach of duty, as respects him, in permitting them to be used.

It appears that the plaintiff entered the defendants' employment early in May, 1908, and on July 17, when the accident occurred, had worked for them about ten weeks. The first week he was employed in unloading wood at the base of the mountain. From that time on he worked at various points on the railway, the last of his work being at the summit, rebuilding the tracks that were destroyed when the Tiptop House was burned and removing the debris caused by the fire in the destruction of the building. Throughout his employment he and the other members of the crew boarded at the base of the mountain. Their labors began at seven o'clock in the morning and ended at six o'clock at night. They left the base on the work train at seven o'clock in the morning to go up the mountain, taking their dinners with them. This train was made up of a flat car and an engine. The passenger trains began to run June 29. Down to that time the work train remained on the mountain until quarter of five in the afternoon, when it returned to the base.

About a week before June 29, the foreman instructed the men to get out the slide-boards to practice on, as they would have to use

them when the passenger trains came on.  Before this they had gone down the mountain at night on the work train.  The crew then consisted of John Camden, Joe Meaney, Patrick Maloney, Steve Meaney, Kindellan, and one or two others.  All of the men, except Steve Meaney, procured slide-boards and came down on them that week ahead of the work train.  After that they left the summit as a rule at half past five.  Steve Meaney came down on a slide-board two or three times before June 29.  On that day two or three of the men left the track crew and worked as engineers or firemen on the trains.  Thereafter Steve Meaney had a slide-board on which he regularly made the descent with the other members of the crew, with the exception of two wet or foggy nights, when, as he expressed it, he was "new on the board" and came down on the train.  It took an hour and fifteen minutes for the work train to make the trip down.  The men came down on the boards in half an hour; and as they usually left the summit at half past five, they passed the work train at the water tank, part way down the mountain.  The distance from summit to base was three and a quarter miles.  In using the boards the men were instructed to go slowly, to keep a good distance apart, to stop at the long trestle above Jacob's Ladder and tighten the bolts on the boards, which increased the pressure of the brakes, and to consume half an hour in making the trip.  All of the witnesses testified that if a man had been down on a board from one to three times he would be qualified and could make the descent safely if he observed the rules.

The plaintiff testified that he could make the trip safely in six minutes, but that he could do it more easily and with a greater degree of safety in twelve minutes.  It was more dangerous to go on a board on a wet, foggy night, as the rail would be slippery and greater pressure would be required on the brakes to regulate the speed, and it would be more difficult to see where one was.  All the men had used the boards on foggy nights, some perhaps not as much as others, prior to the accident.  The plaintiff had used them about twenty-five times in all in making the descent, and Steve Meaney about twenty times.  Both had been instructed how to manage a slide-board, they had discussed with other members of the crew the dangers attendant upon making the trip, they knew the necessity of keeping a reasonable distance apart and of going slowly, and they knew the danger, in case one lost control of his board, of running into the man ahead of him and of being run into by one coming from behind.  They had been over the road

twice a day for nine weeks, and knew the nature of the grades and where they were the steepest. They had worked with each other and with all the men in the crew, except Sheehy, from the day they entered the defendants' employment in May. They had been down the mountain repeatedly on slide-boards in company with the other men, knew how they ran their boards and whether they complied with the rules and instructions that had been given them, and knew the increased danger of their use on wet, foggy nights.

But notwithstanding all this, counsel for the plaintiff contend that, inasmuch as there was evidence that during a period of twenty years or more three or four accidents had occurred through slide-boards coming in collision and for a time at least their use was forbidden, the jury were warranted in finding that the plaintiff did not know the dangers and assume the risks attending their use. However, we are unable to see that a knowledge of the facts disclosed by this evidence would have been of any aid to him, for he already knew all the facts concerning the use of slide-boards necessary to his appreciation of the risk; and in our opinion the evidence does not warrant a finding that the defendants were guilty of a breach of duty to the plaintiff because they permitted slide-boards to be used.

Was the plaintiff injured through any fault or neglect of the foreman, for which the defendants were responsible? Counsel for the plaintiff take the position that on the night of the accident the foreman, in the presence of the plaintiff, ordered Steve Meaney and Sheehy to go down on the train, and that the plaintiff would not have gone on a slide-board if he had known that Meaney was to go on one; that the foreman was an incompetent man; and that if he was given charge of the men the defendants ought to have known that his orders would not be obeyed.

The evidence relating to this branch of the case was that on the afternoon of the accident it had rained so that the men did not work. The plaintiff testified that at about quarter past four the foreman came into the stage-house, where he and Steve Meaney and two or three members of the crew were, and said, "take your boards and go ahead of the train tonight"; that they then started in the direction of the train to get their boards, and when they reached the platform beside the track, other members of the crew, including Sheehy, joined them. While they were all together, the foreman told Sheehy and Steve Meaney "not to go on the boards, to go on the train," and turning to the other fellows said: "You better not go too close;

if you do you will kill each other. Keep apart. The track has been greased, and it is rainy, and you will kill each other." Having said this, the foreman turned and went to the Tiptop House. There was a heavy fog upon the mountain, so that at times one could not see more than ten feet; then, again, it would shift and you might see fifty or 150 feet. The plaintiff's board was beside the track, a little below the engine. He procured it and attached it to the center rail. As he did this, he did not see any of the other men. He knew some of them had gone ahead of him, but did not know who. He started off without further ascertaining what the rest of the men were to do. Steve Meaney followed later and, having let his board go too fast on the long trestle, he ran into the plaintiff on Jacob's Ladder, threw him off, and injured him. The plaintiff testified that he really believed the foreman thought Meaney would obey him; that he had never known him to disobey any strict orders; and although the men had disobeyed the foreman as to some small things, as he had probably done himself, they would not do so before him.

Now, if the foreman gave this order to Meaney, as the plaintiff testified, we are at a loss to see how his incompetency, if he was incompetent, could be found to have in any way contributed to cause the plaintiff's injury. The order was an entirely proper one, and if obeyed the accident would not have happened. There was no evidence that Horne, the defendants' superintendent, ever knew that the men disobeyed the foreman's orders; and the evidence would not justify a conclusion that he ought to have known of it.

Counsel also contend that if the order to Meaney not to go on a board, but to go on the train, was not given, the plaintiff had no reason to think that Meaney would go on a board that night, as it was wet and foggy; that it had not been customary for him to go on a board on such a night; and therefore the plaintiff could not be held to have assumed the risk of being injured by him in case the defendants permitted him to go. The order "not to go down on the boards," etc., was either given or not given. We have discussed its bearing in case it was given. We will now discuss the evidence on the basis that it was not given. If it was not given, then the question is: Was there evidence from which it could be found that the plaintiff had reason to believe that Meaney was not to go on a board that night? The plaintiff says it was not Meaney's custom to go on a board on wet or foggy nights. The only evidence as to this was that when Meaney was a new man—that is, when he first

began using a board—there were two nights when it was wet and foggy that he went down on the train, and one other such night when he went on a board. But we do not think this would warrant the jury in finding that it was his custom to go on the train on such nights, and that the plaintiff would be justiffed in assuming that he would not go on a board. The train was on the mountain the night of the accident. The plaintiff justifies his own conduct in coming down on a board instead of on the train, upon the ground that he was ordered by the foreman to go on a board ahead of the train. This order is the one the foreman gave at the stage-house, when he came in there to notify the men to get ready to go down the mountain. It will be recalled that this order was given to all the men in the stage-house, and that Steve Meaney was there and heard the order the same as all the rest. The plaintiff himself so testified. Meaney also testified that the boss came in and "told us we better go down ahead of the train." Now if the plaintiff had reason to believe that he was ordered by the foreman to go on a board, he had just as much reason for believing that Meaney, to whom the order was given as well as to himself, would go on a board; and as he had never known him to disobey strict orders, that he would not in this case.

The evidence also discloses that the plaintiff knew as much or more than the foreman did about Meaney's capacity to manage a slide-board. He had worked with him every day from the first of the season to the day of the accident. He had been down the mountain on slide-boards with him, sometimes starting just ahead, then again just behind him. He knew the increased danger because of fog and rain, and testified that he and the rest of the men were warned this very night by the foreman that the track had been greased, that it was rainy, and that if they went down that night and went too close, they would kill each other. The only reasonable conclusion fair-minded men could draw from the evidence was that the plaintiff knew and appreciated the danger and assumed the risk.

The plaintiff was not a passenger. His trip down the mountain was a mere incident of his employment. *Gillshannon* v. *Railroad,* 10 Cush. 228; *Dickinson* v. *Railway,* 177 Mass. 365; *Kilduff* v. *Railway,* 195 Mass. 307; 6 Cyc. 543. The order is,

*Verdict set aside: judgment for the defendants.*

All concurred.