Merrimack, }
Jan. 26, 1925. }

### EVA DEROSIER, *Adm'x*, v. NEW ENGLAND TELEPHONE & TELEGRAPH COMPANY.

While the construction of a contract or other written document primarily presents a question for the court, yet, when the construction or application of the document involves the determination of questions of fact outside of the writing, the intention of the parties may be submitted to the jury upon proper instructions.

The construction put upon a writing by a jury is reviewable in the supreme court, when the writing and the evidence are fully transferred.

The violation of a rule of a corporation obviously designed to guard against a particular danger cannot be relied upon as proof of negligence when the injury was caused by another danger which the rule was not designed to guard against.

A custom of a corporation to do what its rule requires cannot be given a broader interpretation than the rule itself. The rule and custom might be admissible as evidence of the kind of protection which would be suitable if protection against the danger which caused the injury were found to be a duty of the defendant.

Negligent intervention of a third person which is a necessary element in the causation of the injury does not necessarily exonerate a defendant who was bound to anticipate and guard against some intervention which might have caused similar results.

Liability for injury due to negligence does not depend upon anticipation by the negligent party of the exact way in which his wrong is to become operative and cause injury.

Upon the issue of fault, likelihood that an event may occur is a material fact, since the outlook is toward the future. But upon the issue of proximate cause the inquiry concerns events that have become facts, and the antecedent probability of such results occurring from the negligent act is immaterial.

One using the premises of another by invitation has the right to assume that

they are in reasonably safe condition for his use, in the absence of indication to the contrary, and is not bound to inspect them with a view to discovering possible danger due to negligence in their maintenance.

A motion to limit the issues to be retried for the correction of errors should ordinarily be addressed to the superior court in the first instance.

The jury having been erroneously allowed to find the defendant's culpable violation of its own rules and of its contract with the plaintiff's employer, it is obvious that the prejudice thus created may have affected the finding on damages, and the whole case must be retried.

CASE, for negligence. Plaintiff's intestate, Albert Derosier, an employee of the Manchester Traction, Light and Power Company, was electrocuted while climbing a pole owned and used in common by his employer and the defendant. The pole was situated upon the westerly side of Arlington Street, and the northerly side of Williams Street, at their junction. The pole was originally owned by the defendant but had for some years been used by both companies. Prior to the accident the pole had become joint property by a written agreement under which the defendant had assumed the maintenance of the pole, and each party had agreed "to place, maintain and be solely responsible for its cross arms, fixtures and wires, and for the electric currents employed by it in the conduct of its business, and for any damages to persons or property due solely to its act or neglect. . . ."

At the time of the accident the defendant maintained upon this pole two cables, each supported by a messenger wire. The cable here more particularly involved, and known as No. 1, extended north and south on Arlington Street and was attached to the pole on the street side by a suspension bolt at a point 21 feet from the ground. The other cable, known as No. 2, which was parallel to and one foot above cable No. 1, came south on Arlington Street and dead-ended at an eyebolt on the north side of the pole, where it turned westerly to Williams Street. Each cable was enclosed in lead coverings about the size of a garden hose, and was suspended by metallic clips, about an inch below its messenger wire. The messenger wires and cables were grounded. These fixtures were thus maintained before joint ownership. The defendant had no cross arms, and no other wires or fixtures upon the pole.

The traction company maintained upon the pole (1) a double cross arm, eight feet long and extending east and west, which carried upon its easterly end, and somewhat over four feet above the defendant's lower cable, power wires charged with 2300 volt electric current; (2) a single cross arm parallel to this double arm, but two feet higher,

supporting wires carrying secondary lighting circuits of 110 volts and arc light circuits of some 3000 volts; (3) a buck arm extending north and south two inches below the single arm and supporting wires deflected to Williams Street; (4) a mast arm twelve feet long, attached to the pole about two feet above the defendant's lower cable and extending in a southeasterly direction, held in place by guy wires from the pole, and itself supporting at its outer end an arc light in a position to light both streets. These guy wires contained no insulators. Under the terms of its contract with the defendant, the traction company was required to insert a strain insulator in every guy upon jointly used poles, at a point from six to eight feet horizontally distant from the pole.

About two feet above the traction company's upper cross arm was an arm occupied by the city with police and fire-alarm wires. Upon the northerly and southerly side of the lower portion of the pole there were iron pins at a distance of approximately 18 inches apart, alternately placed for use in climbing, the uppermost pin being between two and three inches below the defendant's cable. Derosier was equipped with climbing irons or spurs, and it could be found that he was an experienced lineman. He had formerly been in the defendant's employ.

The night before the accident Derosier, with a fellow lineman in charge of the work, had traced a "ground" to the vicinity of the pole. Believing that the trouble was due to a cross in the arc and the secondary 110 volt wires leading from the buck arm down Williams Street, Derosier started to ascend the pole, planning to pass above the defendant's cable to a position where he could get a better view of the proximity of the suspected wires. He ascended the pole from the street side, and, while swinging into climbing space on the south side of the pole, grasped the cable with his left hand and the mast arm with his right, receiving through his body a 2300 volt current which had escaped to the mast arm from the traction company's power circuit through contact with one of its guys supporting the arm. Other facts will appear in the opinion.

Trial by jury and verdict for the plaintiff. Transferred by *Branch*, J., upon the defendant's exceptions to evidence, to the charge, to refusal to charge, and to the denial of its motions for a nonsuit and for a directed verdict.

*Robert W. Upton, Peter J. King, John M. Stark and Edward C. Niles* (*Mr. Niles* orally), for the plaintiff.

*Drew & Carr* (of Massachusetts; *Mr. Pitt F. Drew* orally), for the defendant.

SNOW, J.   I.   It was the plaintiff's contention at the trial that injuries to a lineman by coming in contact with the defendant's telephone cable and the traction company's electricity were naturally to be apprehended from the usual and ordinary method of doing a lineman's work, and that it was therefore the defendant's duty to provide against that danger by installing a guard arm above the cable with which Derosier came in contact.   In support of this position the plaintiff relied upon a printed rule adopted by the defendant and upon a similar provision in its contract with the traction company for the use of joint poles.   Each provided for the maintenance of guard arms above the defendant's cables under circumstances therein prescribed.   Reliance was also placed upon the earlier custom of the defendant to maintain such guard arms, of which it was claimed the rule and contract simply gave written expression.

There was evidence from which it could be found that, for some twelve or fifteen years prior to the accident, whenever the defendant's cables were attached directly to jointly used wooden poles within six feet below electric light wires supported by the same pole, it was the defendant's practice to maintain guard arms, parallel with and three fourths of an inch to an inch above the suspension wires supporting its cables.   These arms, four feet long, four inches thick, and three and one half inches wide, were fastened to the pole by lags or bolts.   The year last preceding the accident the defendant put into effect rules for the construction and maintenance of jointly used wooden pole lines, a material portion of which reads, "Where a suspension wire, carrying Class C. cable or wires, is attached directly to the pole and the suspension wire is less than seventy-two inches below the lowest Class B. attachment in the Class B. space, a wooden guard arm shall be attached to the pole immediately above and substantially parallel to such suspension wire.   The guard arm shall be at least forty-eight inches in length and shall be securely fastened to the pole.   On corner poles, where the cable turns, the guard arm shall be placed along the climbing side of the pole."   The defendant's cable and wire were of Class C., and the light company's wires above were Class B. attachments.   Contemporaneously with the adoption of these rules the defendant entered into a written agreement with the light company, a material provision of which reads, "Where the messenger wire is below the electric light lines it shall be placed

upon the pole at a vertical distance of not less than four feet below the lowest cross-arm occupied by the Lighting Company. Where the messenger wire is below the electric light lines and at a distance not exceeding six (6) feet from the lowest cross-arm carrying those lines measured vertically to the messenger wire at the point of support, the Telephone Company shall place upon the pole immediately above the messenger wire, and substantially parallel but not in contact therewith, a standard wooden cross-arm not less than four (4) feet in length, which shall be fastened at its center to the pole by the equivalent of at least two standard cross-arm lag bolts."

The plaintiff offered the practice, rule and contract as evidence of the recognition by the defendant of the dangers of the situation, and as an admission that the protection of a guard arm in the manner provided by the rule was required for the safety of linemen in the situation Derosier was in at the time he was injured. Her contention was that the guard provided for by the rule was designed to minimize all the dangers that a lineman ran of coming in contact with an electric current and the defendant's cable at the same time; that the required guard, if installed, would have prevented the accident; and that the defendant's failure to install it was therefore the cause of Derosier's injury. On the other hand the defendant contended that the guard arm required by the rule was not designed to furnish protection against the danger which caused the injury to Derosier, but that its purpose was solely for the use of the lineman as a foot rest while he was working on the electric wires above, as a protection both to the lineman and to the defendant's wire and cable. The question thus raised as to the purpose of a guard arm under the contract, rule and custom of the defendant was submitted to the jury with instructions.

Notwithstanding that the construction of a contract or other written document primarily presents a question for the court, nevertheless, when the construction or application of the document involves the determination of questions of fact outside of the writing, the intention of the parties may be submitted to the jury upon proper instructions. *Bartlett* v. *Hoyt*, 33 N. H. 151, 165, 166; *Folsom* v. *Plumer*, 43 N. H. 469, 472; *Field* v. *Tenney*, 47 N. H. 513, 521; *Hall* v. *Brown*, 58 N. H. 93, 98; *Robin* v. *Bartlett*, 64 N. H. 426, 428; *Hill* v. *Carr*, 78 N. H. 458, 460. In such case the rights of the parties can be abundantly protected by exceptions to the charge or refusal to charge. Whichever method is adopted, such construction is, however, reviewable by this court, when the writing and the evi-

dence or facts are fully transferred, as they are here. *Kidd* v. *Traction Co.*, 74 N. H. 160, 170; *Kendall* v. *Green*, 67 N. H. 557, 562, 563; *Emery* v. *Dana*, 76 N. H. 483, 486.

So far as the legal principles here under discussion apply equally to the contract and the rule, the two provisions will be treated as one and referred to as the rule. The rule requiring a guard arm above cables is valueless as evidence of the defendant's negligence unless it can be construed as an admission by the defendant of a duty owed the plaintiff, the failure of the performance of which resulted in his injury. *Carr* v. *Electric Co.*, 70 N. H. 308, 310. If the required guard was designed only to protect linemen from the ordinary risk of double contact with the defendant's cable and the electric company's wires, manifestly it does not help the plaintiff, since the electric wires are required by the same rules to be forty inches above the defendant's suspension wire, and Derosier had not reached the danger zone. To avail the plaintiff here the purpose must have been much broader, or, to be explicit, it must have included the protection of linemen, while climbing poles, from unexpected dangers arising from escaped electric current.

While the rule does not explicitly define the purpose of the guard arm, such purpose seems reasonably clear. The fact that it is required *only* when the suspension wire is within less than seventy-two inches below the lowest electric wires, which, as we have seen, must in any event be forty inches above the suspension wire supporting the cables, gives rise to a strong inference that, so far as the guard arm was designed to protect linemen, it was to prevent their contact at one and the same time with the charged wires above and the grounded cable below; or, as expressed by the defendant's division foreman, called by the plaintiff as a witness, — to prevent the linemen from standing on the cable or messenger wire when working on the electric light wires above. It is true that the plaintiff is not bound by this witness's testimony, but no other inference is fairly deducible from the language of the rule. The fact that upon corner poles, where the cable turns, the guard is to be placed along the climbing side of the pole, is consistent with the natural inference to be drawn from the language of the body of the rule, and does not modify or enlarge the apparent purpose therein expressed. Nor is the fact that linemen in climbing a pole had been, and were, accustomed to take hold of any objects (including guard arms) which they could reach, competent evidence of the defendant's intention in promulgating the rule. The rule obviously deals with the direct dangers

arising from the proximity of the charged wires with the grounded cable. Here was a manifest danger both to the defendant's wires and to the person of the lineman which abundantly justified the regulation. No other fixtures or appliances are mentioned in the rule. There is nothing in the language which discloses a purpose to guard against dangers from unexpected sources, as from current from defective wires transmitted by means of other defective appliances to unmentioned fixtures. To hold that the purpose of the rule was to minimize all dangers is to inject into the rule a meaning not expressed by its terms when applied to the subject matter upon which it is to operate, and to impute to the defendant a purpose not fairly deducible from the language. The violation of a rule which on its face was designed to guard the property of the defendant and the person of a lineman against one very obvious danger cannot be relied upon as proof of negligence when the injury was caused by another danger which the rule was not designed to guard against. *McGlauflin* v. *Railroad*, 230 Mass. 431.

The plaintiff, however, contends that, independently of the rule and contract, the defendant's custom to maintain guards above its cables and suspension wires when within seventy-two inches of the electric wires above, in view of the habit of linemen to use such guards in climbing, is evidence from which an admission of the defendant's negligence can be inferred. Since the custom was only coextensive with the rule which gave it written expression, it is subject to the same interpretation. An admission of an unexpressed purpose is no more to be implied from its adoption than is a like purpose to be inferred from the adoption of the rule. As the habit of linemen was not peculiar to guard arms but applied to everything within reach, the defendant's knowledge of the custom no more explains the purpose of a guard arm than it does the purpose of the mast arm and of every other appliance on the pole capable of a hand-hold. It is mere conjecture to say that the defendant by its custom of maintaining a guard, obviously necessary to protect against a direct contact, had in mind, and therefore was chargeable with an admission, that the guard arm was intended to minimize all dangers.

It is not intended by the foregoing to hold that the rule, the contract and the custom of installing guard arms above the defendant's cables are not one or all admissible as evidence of a kind of protection which might be found to be suitable if protection of the cable were found to be a duty of the defendant. The error lies in the use made of the evidence. As it was admitted and considered in

proof of a fact for which it was not competent, it follows that there has been a mistrial.

II. Was the plaintiff entitled to go to the jury on other grounds? In support of its motion for a directed verdict the defendant contends, (1) that it did not owe Derosier a duty to guard its grounded cable; (2) that the absence of a guard arm was not the proximate cause of the injury; (3) and that Derosier was not himself in the exercise of due care. A consideration of these questions calls for a further statement of facts.

There was no evidence or claim that the proximity of the mast arm and cable was unusual or that the cable was not properly grounded. The abnormal thing was the charged condition of the mast arm. This was due to a combination of conditions and events. The mast arm was held in its horizontal position by a supporting guy reaching from its outer end to an eyebolt in the pole at a point above the upper cross arm, and in its lateral position by spreading guys likewise attached to its outer end and to bolts on either side of the pole at a point below said cross arm. The pole, by reason of its age and the lateral tension of the Williams Street cable, leaned noticeably toward the west, because of which the mast arm had a tendency to swing in that direction. The easterly one of the spreading guys had so far yielded to the resulting strain that the mast arm had swung westerly until the supporting guy had come in contact with one of the 2300 volt wires. The guy had worn through the insulation on the top of the charged wire, permitting direct contact. By reason of the absence of an insulator in this guy, the mast arm as well as the guys had become charged. Enumerated in an order most convenient for understanding, these conditions and events consisted of (1) the lean of the pole, (2) the yielding of the easterly lateral guy to the force of gravity acting on the mast arm and lamp, (3) the breaking down of the insulation upon the 2300 volt wire, and (4) the absence of a strain insulator in the supporting guy, permitting the electricity to flow to the mast arm. The accident would not have happened in the absence of any one of these conditions or events in the chain of causation. Their sequence in point of time is not conclusively fixed, but it could be found on the evidence that the pole had leaned for "weeks" and "months"; that the supporting guy must have been rubbing upon the 2300 volt wire for a considerable period of time in order to wear a hole through its insulation; that no insulators had ever been inserted in the guy since the mast arm was installed.

When the defendant furnished the pole for joint occupation and undertook its maintenance, it assumed a duty to the traction company's linemen to do what the ordinary man in the defendant's situation would have done to make and keep the pole safe for climbing. It owed this duty to Derosier, who was rightfully upon the pole. The defendant's undertaking was to provide support for equipment and appliances whose contact by misplacement was obviously fraught with perilous consequences. It could be found that the first requisite in the performance of that duty was to maintain the vertical or normal position of the pole, with view to which it must be assumed that all attachments were made. The great peril to be guarded against was the escape of a dangerous electric current, and its potential presence in unexpected places. The leaning of the pole and the consequent swinging of the mast arm would manifestly increase the chance of the existence of this peril. Anything that brought the guy wire in contact with wires carrying current would facilitate such escape. Whether such a result ought to have been anticipated and guarded against, even though the traction company had agreed to take other preventive measures (*Pittsfield &c. Company* v. *Company*, 72 N. H. 546, 547), was a plain question of fact. The danger to be encountered was so great and so subtle that it could be found that the ordinary man would have taken every reasonable precaution to prevent its existence. Upon such facts it could also be found that the defendant negligently set in motion forces "beyond his [its] power to stop or safely direct." *Underhill* v. *Manchester,* 45 N. H. 214, 218.

But the question of the defendant's duty to anticipate the negligence of the traction company may be laid out of the reckoning in the consideration of the defendant's fault in failing properly to maintain the pole. Precaution being a duty only so far as there is occasion to anticipate results, it is argued that there is no breach of duty where the only injurious result to be encountered is one to be caused in part by the concurring negligence of a third party. Whether one can ever be held to a duty to anticipate and provide against the probable or possible future negligence of such third party is a question upon which the authorities are not agreed; but it is not necessary to consider it here. The duty to take care to prevent contact of the wires is here shown by facts independent of the fault of the traction company. It could be found that the defendant should have anticipated that a negligent maintenance of the pole would cause the mast arm to swing, the wires to come in

contact and the current to escape to the guy. Conceding that it was not bound to anticipate the negligence of the traction company in failing to stop the current by the insertion of an insulator, its fault is not thereby negatived. Neglect of a third party to take measures to protect the plaintiff from the results of the defendant's fault does not excuse the defendant. *Stevens* v. *Company*, 73 N. H. 159. The escape of the current from its intended course was due to the carelessness of the defendant. It was not a proper condition to allow the current to be in even an insulated part of the guy. That fault, combined with the fault of the traction company, permitted the mast arm to be charged. Neither wrong was prior to the other in a legal sense. Both had existed for some time, and the result of their joint existence was the creation of the danger Derosier encountered.

Stated broadly, it was the duty of each company to do its part to keep the current from escaping from the wires. Many different casualties might result from any escape. The duty was not merely to guard against certain accidents. It was to use care to keep the current in its place, and so guard against accidents due to an escaped current. The duty existed because an escaped current is dangerous. The duty being thus established, its breach gives the plaintiff a right of action if damage ensues. The fact that the negligence of a third person concurs to cause the damage is immaterial, unless the latter fault so intervenes as to be what is usually called the proximate cause, and to render the former fault the mere occasion of the injury. In the case last supposed the question is not one of the defendant's dereliction but of legal cause.

This principle has frequently been applied in this jurisdiction. In *Ela* v. *Company*, 71 N. H. 1, it was held that the defendant could be found to be in fault for not properly securing its wires against falling into the highway, because woods grew alongside and the trees might be blown across the wires, or might be felled there by one using due care. That established the defendant's dereliction. It was also held that if such negligence combined with the wrongful act of the man cutting trees to cause the injury the defendant would be liable. The only exception suggested is that "If he felled the tree against the wires with the intention of forcing them into the highway, his act might be the proximate cause of the plaintiff's injury." *Ib.* 4.

In *Hamel* v. *Company*, 73 N. H. 386, there was evidence that the defendant ought to have anticipated that workmen might remove

the caps from the bearings of a shafting which the plaintiff was required to turn; and that consequently the defendant should have warned the plaintiff of the danger. Failure to warn established the defendant's fault. The fact that the removal of the caps by a fellow servant was, under the circumstances, a negligent act was held to be no defence, but merely a concurring cause of the injury.

In *Vaisbord* v. *Company*, 74 N. H. 470, 473, the defendant constructed a staging in its mill and left the planks unfastened and liable to fall, either from the vibration of the mill or the striking of the uprights by trucks moved by employees. This showed the defendant to be in fault "for maintaining such a staging"; and the fact that the fall of a plank was induced by the negligent act of another servant in striking an upright with a moving truck did not exonerate the defendant.

Each of these cases was stronger for the defendant than the present one in that in each the fault of the third party was strictly an intervening one which acted upon a negligent situation created by the defendant. Lynch felled the tree after the wire line was constructed, Kelley removed the arbor caps after the uninstructed plaintiff had been put to work on the shafting, and the truck was propelled against the completed staging. They plainly establish the rule that the fact of negligent intervention which is an essential part of causation does not necessarily exonerate a defendant who was bound to anticipate and provide against some intervention which might have caused similar results. Whether this conclusion rests upon the proposition that breach of duty is established by proof of failure to anticipate the chance that others may be negligent, or because precautions were required for other reasons, is not made entirely clear by the cases. Apparently they rest upon the latter hypothesis.

This view harmonizes with the well established rule here that "Upon the question whether the defendant has been guilty of negligence, the rule of reasonable anticipation applies. *Minot* v. *Railroad*, 73 N. H. 317, 321, and cases cited. But when his fault has been established, the rule has no application upon the issue of damages." *Bowley* v. *Duca*, 80 N. H. 548, 552; *Tuttle* v. *Dodge*, 80 N. H. 304, 311.

Because the issue as to anticipation is one of reasonableness, the error has sometimes been made of assuming that reason for the defendant to anticipate the precise damage suffered is the test. The law is otherwise here.

A closer question is whether reason to anticipate the infliction

of some damage in this particular way is decisive of liability. In a rather general sense it may be said to be so. In the *Ela* case the defendant must have had reason to anticipate danger from fallen wires. In the *Hamel* case the defendant was bound to know that if workmen turned the liberated shafting an accident was likely to occur. And in the *Vaisbord* case apprehension of injury from a falling plank was essential. In this sense reason to anticipate adverse results is required to establish liability.

The limitation of liability does not here extend beyond this, so far as the issue of the defendant's fault is concerned. Anticipation of the exact way in which its wrong is to become operative and cause injury is not required. If it were, then the three cases just cited were either wrongly decided or inadequately considered. The apprehension of danger from fallen wires, insecure staging or uncontrolled shafting, is fairly comparable to that from an escaping electric current. Anticipation of how the defendant's wrong was to be added to and made efficient is no more essential here than it was in the earlier cases.

There was sufficient evidence that the defendant was in fault. Whether that fault caused the injury is a different question, to which other considerations apply. No legal question has been more discussed in the cases than this one of legal cause, or as it has commonly been termed, proximate cause. Very many attempts have been made to frame a definition or state a test which will determine whether there is or is not liability in all cases. None of these attempts have been successful. Their failure results necessarily from the nature of the problem. The question is essentially one of fact, and is so treated in this jurisdiction. *Ela* v. *Company*, 71 N. H. 1, 3; *Prichard* v. *Boscawen*, 78 N. H. 131; *Robertson* v. *Monroe*, 80 N. H. 258, 262. Whether there is any evidence upon which a conclusion one way or the other could be based is matter of law. *Searle* v. *Park*, 68 N. H. 311, 312; *Gage* v. *Railroad*, 77 N. H. 289, 295; *Morier* v. *Hines*, ante, 48, 54. It happens that in many cases the result is so immediate that the evidence does not admit of any other conclusion than responsibility. And in other cases the causation is so inconsiderable and so far removed that it is entirely clear that the law of responsibility, as at present understood and administered, cannot lay hold of it as ground for legal action. But the bulk of the litigated cases lie between these boundaries. They each present a fair question of fact, to be decided upon the circumstances of the particular case.

Upon each issue, fault and causation, there may be a question of the logical relation of events. As to duty this looks to the future; it is a matter of probability. Precaution being a duty only so far as there is reason to apprehend results, the question of the reasonable and natural sequence of events becomes material and controlling in the inquiry as to what legal duty requires one to do or refrain from doing. The issue being of duty to anticipate, likelihood or unlikelihood of a future happening is the turning point. We are not here dealing with the question of causation, but of duty. The viewpoint is from the present toward the future.

But upon the second question — whether a breach of duty caused recoverable damage — the inquiry concerns events that have become facts. This result has happened. The issue of probability is not here a controlling one, the inquiry being for the efficient cause. Jeremiah Smith, in 25 Harv. Law Rev. 103, 223, 303.

The argument advanced in this case is that the defendant was not bound to anticipate the fault of the traction company, and that the ensuing result was not foreseeable and therefore was not in law caused by the defendant's fault. There are cases where the decision supports this conclusion, and many more containing language to the same effect. The error has arisen largely from a failure to distinguish between breach of duty and causal connection. As to the former, probability of injury is essential; as to the latter, it is not.

It would seem to be axiomatic that the direct and immediate results of setting force in motion are proximately caused by such act. But because foreseeable results are in general held to be proximate, the error has been made of assuming that those not foreseeable are never proximate. And because a want of care cannot be predicated upon a failure to anticipate and provide against an unforeseeable event, it has been assumed that want of care cannot be the proximate cause of such an event. Neither conclusion is sound law. The forseeable quality of an event following a breach of duty is always material upon the issue of accountability for the act. Upon the question of causation, this quality is material only as it operates through the moral aspect of the case, which not infrequently has directed the course of the law. He should have foreseen, therefore he is morally guilty. Causation, as distinguished from duty, is purely a matter of producing a subsequent event. In determining how far the law will trace causation and afford a remedy, the facts as to the defendant's intent, his imputable knowledge, or his justifiable ignorance are often taken into account. The moral element is

here the factor that has turned close cases one way or the other. For an intended injury the law is astute to discover even very remote causation. For one which the defendant merely ought to have anticipated it has often stopped at an earlier stage of the investigation of causal connection. And as to those where there was neither knowledge nor duty to foresee, it has usually limited accountability to direct and immediate results. This is not because the defendant's act was a more immediate cause in one case than in the others, but because it has been felt to be just and reasonable that liability should extend to results further removed when certain elements of fault were present. Treating all these cases as turning upon an issue of immediateness of causation has resulted in much confusion of ideas and made the conflict of decisions appear to be greater than it is. Most of the cases wherein inability to foresee has been held to be an answer to the plaintiff's claim of causation are those where the result was not immediate, but depended largely upon extrinsic and intervening causes. The result was somewhat remote, and a morally innocent party ought not to be held liable, though one morally guilty should be. The decisions do not turn on remoteness of causation alone, but upon such remoteness plus freedom from moral fault.

The present case is not of that character. The causation was not remote in fact. The defendant's negligence operated upon an existing condition. Its act of sending the current into the guy caused the mast arm to be charged. True it is that it would not have had this result but for the preceding neglect of the traction company to install an insulator. But this prior fault cannot by any reasoning be turned into a subsequent one. Instead of the neglect of the traction company acting upon a negligent situation created by the defendant, the case presents the reverse situation. "Every condition of what might be called the set stage on which the last active force acted is a precedent force; and of course no precedent force can operate to make a subsequent force remote." 33 Harv. Law Rev. 641.

The dangerous current was turned into a forbidden course by the act of the defendant. It went farther on that course than it otherwise would because of the combining fault of the traction company. If the neglect of the traction company had occurred after that of the defendant, and with knowledge of the defendant's fault, there might be ground to claim that the later fault was the sole legal cause. But when, as here, each neglect was apparently committed without knowledge of the other, the case, in the aspect most favorable to the

defendant, is the ordinary one of concurring fault, and each party is a wrongdoer.

If the defendant's wrong was not the proximate or legal cause of the accident because the defendant was not bound to foresee the negligence of the traction company, it must be equally true that the wrong of the traction company was not such cause for a similar reason. The traction company was no more bound to foresee a co-worker's dereliction than was the defendant. Thus it would follow that each wrongdoer would escape liability upon the ground that his fault was not the proximate cause of an injury which in fact resulted from the operation of the fault of both. If either fault was prior to the other in a legal sense it was that of the traction company. So far as precedence in time is of importance, the facts are against the defendant.

The plaintiff made a case for the jury upon the question of the maintenance of the pole because the evidence tends to show a neglect to keep the wires from coming in contact, and an injury resulting directly and immediately from such failure to keep the guy and the charged wire apart.

The breach of duty claimed at the trial was the failure of the defendant to maintain a guard arm immediately above its cable. Evidence of the faulty maintenance of the pole, the consequent swinging of the mast arm and the charging of the guy by contact appears to have been offered, primarily if not solely, in proof of the unusually dangerous situation, emphasizing the necessity of a guard arm. Accordingly, the abnormal position of the pole was not submitted to the jury as the negligent failure of duty relied upon. It follows that the present verdict could not be sustained on such ground. If there were no other ground of recovery (*Gage* v. *Railroad*, 77 N. H. 289, 296), and if the abnormal position of the pole could not be found to be an essential element in the ground relied upon (*Martel* v. *White Mills*, 79 N. H. 439, 443), the plaintiff's only remedy might be a petition for a new trial upon the ground of accident or mistake. As the case is for retrial the issue of negligence in the maintenance of the pole has been considered.

The plaintiff, however, under the evidence was entitled to go to the jury upon the issue upon which the case was tried. It could be found that the pole had leaned for a long period of time, weeks or months, and that the resulting contact of the guy with the power wire had continued for a considerable period of time, that the insulation had worn off and the current had been set free. As we

have seen, it was a case of continuing. faulty maintenance. The defendant was chargeable with knowledge of these conditions and of the danger incident to the escaped current. If the defendant desired to continue a standard of pole maintenance the probable effect of which would. be to turn such a dangerous force from its usual channels into appliances normally harmless, it owed to persons whose rightful presence upon the pole was to be expected a duty commensurate with the increased hazard. *Collins* v. *Hustis,* 79 N. H. 446, 449, 450. The fact that the force which had been liberated was invisible, and its presence difficult to detect, would operate greatly to increase the vigilance of the ordinary man in the defendant's position. It could. be found that he would not have been content to rely upon the performance of a contract with a third party to provide a stop for a dangerous current which he had turned loose, but would have made sure by inspection that such a barrier did in fact exist. Or it could be found that the ordinary man, permitting such abnormal conditions to exist without inspection, would have either given notice to linemen of the condition (*Willis* v. *Company,* 75 N. H. 453, 455), so that by reasonable care they could have avoided the danger, or that he would have adopted some other form of protection. On the evidence it could be found that one method of affording protection was to install a guard above its cable. It is conceded that such a guard is a protection to a lineman standing above the cable while working directly upon the wires. There was evidence that, where such a guard arm was maintained, it was also used by linemen in climbing, and that linemen regarded it as a protection to them while so doing. With knowledge of this custom and of such reliance the defendant was chargeable. It cannot, therefore, be said as a matter of law that reasonable men might not find, in view of such knowledge and of the conditions it suffered to exist, that the defendant was negligent in failing to guard its grounded cable.

The claim that the invitation to Derosier did not extend to permitting. him to take hold of the cable and that therefore the defendant owed him no duty in respect to that situation (*Leavitt* v. *Company,* 69 N. H. 597, 598) cannot be sustained. Upon the evidence that it was the custom of linemen to lay hold of anything available for a hand-hold when climbing, it was permissible to find hat Derosier's act of taking hold of the cable was a reasonable nd lawful exercise of his permission to be upon the defendant's remises and to act as one of his known vocation would in reference

to his surroundings. *Hobbs* v. *Company*, 75 N. H. 73, 83; *True* v. *Creamery*, 72 N. H. 154, 156; *Stevens* v. *Company*, 73 N. H. 159; *Morrison* v. *Fibre Co.*, 70 N. H. 406, 408; *Nolette* v. *Company, ante*, 222, 223.

It is argued that the voluntary act of Derosier in grasping the cable, in view of his presumed knowledge of the absence of the guard, amounted to an assumption of the risk. In so far as it is claimed that such knowledge and assumption negatived the duty owed him by the defendant (*Kindellan* v. *Railway*, 76 N. H. 54, 55), his knowledge and assumption must be weighed in the light of the whole situation presented by the evidence. The claimed facts that the defendant had a right to expect that only experienced linemen would be sent upon the pole, and that Derosier was such a lineman, do not conclusively establish his assumption of the risk here. *Stevens* v. *Company*, 73 N. H. 159, 163; *Demars* v. *Company, supra.* The chance he took was only such as it must be found would be presented to his mind by what he saw or ought to have seen. *Boyce* v. *Johnson*, 72 N. H. 41, 44–45. The situation which the defendant could be charged with knowing was the absence of a guard arm and abnormal conditions, while that with which Derosier was chargeable was the absence of a guard arm under normal conditions. *Willis* v. *Company*, 75 N. H. 453, 455–457. The absence of the guard did not tell him the whole situation. *Demars* v. *Company*, 67 N. H. 404; *Riordan* v. *Company, ante*, 384. It follows that it cannot be held that he assumed the unknown risks which the absence of the guard arm presented. Notwithstanding his experience, the case is not different in principle from putting an inexperienced and uninstructed hand at work upon an unguarded saw. The absence of the guard is manifest to him, but it tells him nothin of the danger. In such a situation he may recover for damage cause by the unguarded saw. *Bjork* v. *Company*, 79 N. H. 402; *Olgiati* v. *Company*, 80 N. H. 399, 402–403; *Camire* v. *Company*, 79 N. H. 531, 533. Put in the terms of the present situation, the plaintiff's claim could be predicated upon the absence of the guard. *Goodale* v. *York*, 74 N. H. 454, 455. This, being found to be negligence, is clearly proximate to Derosier's injury if he was himself free from fault.

But it is urged that the negligence of Derosier is conclusively established by the evidence and that therefore there can be no recovery. Laws 1915, *c.* 148, *s.* 1. The argument advanced is based generally upon the proposition that, as he was an experienced line-

man, he knew the situation as well as any one and is to be charged with as much knowledge as the defendant. It is true that he must be held to have known that the pole leaned and that the cable was grounded and unguarded. He must also have known generally the peril of working among electric wires and particularly the danger of coming in contact at the same time with charged appliances and a grounded cable. As we have seen, what he did not know was that the appliances were charged. The fallacy in the defendant's argument lies in the assumption that because it should have known this fact so ought Derosier. This argument fails to take into account the difference in the situation of the two parties. The disparity in the knowledge chargeable to the respective parties arises from the difference in their duties toward the condition of the premises. It could be found that the defendant, maintaining a condition of premises which might result in great danger, was bound to know the progress of events. Derosier, an invitee casually using the premises, did not know and was not to blame for not knowing that the dangerous condition had been permitted to develop without any steps being taken to see that it had not resulted in setting the electric current free. He is not chargeable with knowledge that the defendant had theretofore wholly neglected the situation. *Corbett* v. *Hines*, 80 N. H. 22, 23. The positive duty to use due care to make the situation reasonably safe rested upon the defendant. As we have seen, in view of the continuing faulty maintenance of its pole, it could be found that this duty required inspection, warning or some other protection to linemen. Derosier had a right to rely to a reasonable extent upon the performance of that duty. In the absence of any indication to the contrary he had a right to assume that the situation was safe. *Record* v. *Company*, 79 N. H. 495, 496. It may be conceded that, if he had inspected the pole and its attachments before climbing, he would have discovered the absence of the insulators and the contact of the guy with the wire. But it cannot be said as a matter of law that Derosier had a duty to inspect in order to learn whether the defendant was in fault. *Tierney* v. *Granite Works*, 79 N. H. 166, 167; *Thompson* v. *Bartlett*, 71 N. H. 174, 175, 176. The numerous master and servant cases wherein it has been held that the question of the chargeability of the servant with knowledge of defects was for the jury, are applicable here. They all go to sustain the proposition that the servant is not charged with knowledge which could not be obtained without inspection. See cases above cited; also *Slack* v. *Carter*, 72 N. H. 267; *Hamel* v.

*Company,* 73 N. H. 386; *Corbett* v. *Hines,* 80 N. H. 22; *Turner* v. *Company, ante,* 443. Whether or not Derosier, in his situation and with his knowledge, was guilty of negligence, was clearly a question of fact for the jury.

> *Exception to the charge sustained: the other exceptions overruled: new trial.*

All concurred.

Upon the filing of the foregoing opinion the plaintiff moved that the order setting aside the verdict be limited to the issue of liability.

*Robert W. Upton* (orally), for the plaintiff.

*John P. Carr* (of Massachusetts, orally), for the defendant.

SNOW, J. Under the practice reaffirmed at this sitting in *West* v. *Railroad, post,* a motion to limit the issues to be retried for the correction of errors should ordinarily be addressed to the superior court in the first instance. However, as the plaintiff's motion was entered before the filing of the decision in that case, and as the question raised can be disposed of here, it has been considered.

The error occurred in the trial of the issue of liability. The motion raises the question whether or not it appears from the record that the error may have also affected the assessment of damages. The plaintiff charged the defendant with negligent failure to install a guard arm above its grounded cable. The jury was erroneously allowed to find that by rule, and by written contract, the defendant had both recognized the danger of such a situation and admitted the necessity of the arm for the decedent's protection. The drawing of such inferences presupposed a finding, contrary to the truth, that the defendant's omission to install a guard arm was a breach of a contract it had made with the decedent's employer for the decedent's protection and was in the teeth of a rule it had itself adopted for the protection of its own linemen. In the aspect under discussion, the case is practically identical with *Dow* v. *Latham,* 80 N. H. 492, 499, where the defendant was improperly placed before the jury as operating an automobile in defiance of the statute; nor is it unlike *McBride* v. *Huckins,* 76 N. H. 206, 213, where, by reason of the standard erroneously applied, the defendants were held up to the jury as misrepresenting their skill as surgeons; or *Laird* v. *Railroad,*

80 N. H. 58, 61, where the plaintiff, upon whose testimony his claim depended, was held up to the jury, by the evidence improperly admitted, as untruthful and therefore unworthy of credence. In each of the first two cases it was considered that the error affecting the issue of liability might also have affected the issue of damages, and in the latter that the error affecting damages might likewise have affected the issue of liability. In the present case, the defendant, by reason of the use of the evidence permitted, was erroneously held up to the jury as having violated the provision of an express contract made for the decedent's protection, as well as having disregarded a rule adopted to govern its own conduct. The effect of the erroneous use of the rule and contract is emphasized by the fact that they were the principal reliance of the plaintiff in the proof of liability; or, as the court stated in the charge, "the plaintiff bases her claim largely upon the rule." It appeared at the argument of this motion that the amount awarded was the maximum permitted by statute.

The evidence, because of the objectionable use to which it was put, had a manifest tendency to create a general prejudice, and therefore may have affected the conclusions of the jury upon the issue of damages. As the prejudicial character of the evidence as used conclusively appears from the record, all of which was transferred, the order must be:

*Motion denied: former order confirmed.*

All concurred.