Ronald A. BARRETT, Plaintiff,

v.

**FOSTER GRANT CO., Inc., Defendant and Third-Party Plaintiff,**

v.

**TRANSFORMER SERVICE, INC., Third-Party Defendant.**

Civ. A. No. 2944.

United States District Court,
D. New Hampshire.

Nov. 5, 1970.

On Rehearing Dec. 23, 1970.

William Maynard, Maynard, Dunn & Phillips, Concord, N. H., Paul J. Liacos, Peabody, Mass., for plaintiff.

Lawrence E. Spellman, Sulloway, Hollis, Godfrey & Soden, Concord, N. H., for Foster Grant Co., Inc.

Paul E. Nourie, Wiggin, Nourie, Sundeen, Pingree & Bigg, Manchester, N. H., for Transformer Service, Inc.

## OPINION

BOWNES, District Judge.

This is a tort action brought by an employee of an independent contractor, Transformer Service, Inc., against the owner of electrical transformers, Foster Grant Co., Inc., upon which the plaintiff was working when he incurred severe electrical burns allegedly due to the negligence of the defendant-owner. The defendant-owner brought a third-party complaint against the independent contractor alleging reliance upon representations of the contractor as to the performance of the work, breach of express and implied warranty, and a right of indemnity. Jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332. The plaintiff is a resident of New Hampshire, Foster Grant Co., Inc., is a Delaware corporation with its principal place of business in Massachusetts, and the third-party defendant, Trans-

former Service, Inc., is a New Hampshire corporation. The amount in controversy exceeds $10,000.

### THE FACTS

Foster Grant is a large plastics manufacturer with sunglasses being one of its principal products. At the time of the accident, February 5, 1968, it owned and operated sixteen electrical transformers in conjunction with its manufacturing process at its plant in Leominster, Massachusetts. Three of these transformers have a direct bearing on the facts of the accident. These three, along with four others, were located at the rear of one of the buildings in an area enclosed by a chain link fence. They were located together in a "bank" on the left-hand side of the fenced-in area. Pl's. Ex. 4. Four signs were posted on different sections of the fence stating "Danger - High Voltage." The transformers are identified as number twenty, twenty-one, and twenty-two; twenty-one being the middle transformer and the one on which the plaintiff was working when he was electrocuted; twenty being the transformer on the left; and twenty-two, the transformer on the right looking at the "bank" from outside the fence. D. F.G. Ex. 2. These transformers had been purchased by Foster Grant in 1951 from the Massachusetts Electric Company and they were in the same position and essentially in the same condition on the day of the accident as when originally purchased. The transformers were used to reduce the voltage of the electrical current as received from the main transmission line to a lower voltage so it could be used to power air compressors.

For purposes of this case, it can be stated that there are two sides to a transformer, the high voltage side and the low voltage side. Two high voltage lines run to each transformer and are attached to it on the fence side of the transformer which is the "high" side in the context of this case. Pl. Ex. 3. These high voltage lines constitute a serious danger of electrocution to anyone coming in contact with them. Two low voltage lines emerge from the transformer on the building side approximately opposite the point of attachment of the high voltage lines. D. F.G. Ex. 3. The lines on the low voltage side of the transformer do not constitute the hazard that the lines on the high side do because of the reduced current being carried by them. The danger posed by the high voltage lines is primarily due to the fact that for most of their length from the transmission line to the transformer, they are completely bare, i. e., are not insulated in any way. D. F.G. Ex. 2; Pl. Ex. 14; Pl. Ex. 3. Anyone coming in contact with these bare wires would, therefore, receive a severe electrical shock.

In 1954, Foster Grant hired Transformer Service as an independent contractor to recondition the oil that is used in its transformers. Oil is essential for the effective operation of a transformer and has to be reconditioned from time to time in order for the transformer to continue to function properly. The decision to hire Transformer Service for this work was made on behalf of Foster Grant by Mr. Harvey, its electrical engineer, and the person in charge of maintenance of its electrical installations. The main, if not the sole reason, for deciding to hire Transformer Service was because its reconditioning process did not require that the transformer be de-energized while the process was going on. De-energizing a transformer means shutting off the electrical current to and from it which, in turn, means that the manufacturing process dependent upon that current halts completely. De-energizing these transformers for oil reconditioning would have meant a total plant shut down of production for a period of three and one-half to four hours.

No investigation or check was made by Foster Grant as to the training, experience, and skill of the employees of Transformer Service, Inc. Foster Grant relied exclusively on the representations of Transformer Service through its

salesman and its written material in making its decision to use its services. Mr. Harvey of Foster Grant did observe the work of the Transformer Service employees on the transformers over the years between 1954 and 1968, and considered the employees to be competent and efficient.

There was no written contract between Foster Grant and Transformer Service. The practice followed was for Transformer Service to check the oil in Foster Grant's transformers periodically and then send a written report to Foster Grant. Foster Grant would then decide whether or not to issue a purchase order designating that the oil be reconditioned in certain specified transformers. Upon receipt of such an order, Transformer Service would then proceed to recondition the oil as specified. Transformer Service did not enter into any written indemnity agreement with Foster Grant nor was plaintiff's exhibit 33 sent or given to it by Foster Grant at any time prior to the date of the accident.

A brief description of the oil reconditioning process is now in order. To understand this process, it is necessary first to define the basic parts of a transformer. They are: a "cover" on the top; a "collar" located between the "cover" and the body or "barrel" which contains the oil. In the reconditioning process, a suction hose is first attached to an outlet plug or faucet located at the bottom of the barrel. This hose is run from the transformer to a truck which contains the equipment and materials for reconditioning the oil. The oil is treated in the truck and then returned to the transformer through another hose which is attached to a metal adapter screwed into a hole in the collar. A metal inlet plug first has to be removed so that the hose and adapter can be inserted into the collar. Before the oil reconditioning process starts, a vent or breather plug located in the cover has to be removed so that air can flow into the barrel. The oil reconditioning process is a continuous one with the oil circulating from the transformer to the truck and then back again to the transformer and goes on until the person in charge determines by instruments in the truck that the oil needs no further treatment. The time involved varies from one-half to one and one-half hours depending upon the condition of the oil at the start.

On prior occasions when the employees of Transformer Service were on the premises of Foster Grant to either work on the transformers or take oil samples from them, it had been the practice of Foster Grant, through Mr. Harvey, to assign an electrician to stay with the employees while they were working within the fenced-in area. An employee by the name of Lord, who was an electrician, had been given this assignment on prior occasions and had been told on prior occasions to "be sure that the transformer fellows did not get into a dangerous area." Testimony of Harvey. Since the "transformer fellows" would be working within the fenced-in area, it is obvious that the only really dangerous area was in the vicinity of the bare high voltage wires. Most other companies who used the services of Transformer Service also sent a man to the transformer area to watch the men as they worked and to caution them if they got too close to the bare high wires. The bare wires on this "bank" could have been insulated by a crew of three men in four hours at a cost of about $400, not including the cost of plant shutdown. Such insulation would have prevented, or at least greatly reduced, the chances of electrocution to anyone coming in contact with the bare wires, and it would not have impaired the efficiency of the transformers in any way.

On February 5, 1968, the plaintiff was sent to the plant of Foster Grant at Leominster, Massachusetts, along with another employee of Transformer Service, Inc., Arthur Locke, to recondition the oil in transformers twenty, twenty-one, and twenty-two. Locke was in charge of the work and the plaintiff was his assistant. Although both men had ex-

tensive prior experience in reconditioning oil in transformers, they had no special training in electricity and no training as to the proper safety practices to be followed when working in close proximity to bare high voltage wires. In fact, the president of Transformer Service, Inc., characterized his employes as "plumbers" rather than electrical workers. There was an insulating blanket and electrical insulating gloves in the truck, but neither man had received any instructions in the use of them. The safety instructions that the plaintiff and Locke received at the time of the initial employment for Transformer Service, Inc., were: "Stay away from the high wires, work from the low side of the transformer if possible, and stay awake." Both the plaintiff and Locke knew that the high voltage wires were dangerous and that it was safer to work from the "low" side of the transformer.

After the plaintiff and Locke arrived at the Foster Grant plant, they reported to the chief engineer's office (Harvey) and he assigned Lord, the electrician, to go and stay with them while they worked on the transformers. The plaintiff and Locke understood that Lord was there to watch them and see that they did not get too close to the high wires and relied upon him to do so.

Transformers twenty, twenty-one, and twenty-two were all positioned on separate steel platforms resting on one solid concrete base. The inlet plug on the collar of each of them was located a sufficient distance on the "high" side of the transformer to make it easier to remove the plug and insert the adapter and hose from that side. The distance from the inlet plug on number twenty-one to the closest section of bare high voltage wires was between twenty-four and twenty-six inches. There was no evidence as to the condition or effectiveness of the insulation on that part of the high voltage wire which was insulated, although there was a suggestion in cross-examination of Locke by the attorney for Foster Grant that the purpose of this insulation was not to protect those working on the transformers, but rather to protect the wire from the weather. The vent plug on the cover of transformer twenty-one was on the "high" side of it, while the vent plugs on the covers of the other two transformers were on the "low" side.

The first transformer that the plaintiff and Locke worked on was number twenty-two and, after finishing that, they proceeded to recondition the oil in number twenty. Lord stayed in the enclosed area while the work was done on transformers twenty and twenty-two, but he went inside the building when work on transformer twenty-one started and he was not there when the accident happened or immediately prior to it.

It was the plaintiff's job to remove the vent plug from the cover of the transformer, remove the inlet plug from the collar, insert the adapter into the inlet plug hole, and attach the hose to the adapter. Locke, as the person in charge, attached the suction hose to the outlet plug and then supervised the reconditioning process in the truck.

The plaintiff followed the same work procedure on transformers twenty-two and twenty as he did on number twenty-one, except that on number twenty-one, the vent plug on the cover was not removed because it was on the "high" side and too close to the high wires. Instead of removing the vent plug on the cover of twenty-one, Locke removed a sight gauge used primarily to determine the oil level in the barrel of the transformer which was located on the top of the barrel and on the "low" side of the transformer. The removal of this sight gauge served the same purpose as removing the vent plug, i. e., it allowed air to flow into the barrel.

The procedure used by the plaintiff in working on transformers twenty and twenty-two was as follows: He first removed the vent plug in the cover from the "low" side with a crescent wrench. He then climbed up onto the transformer platform from the "high" side to remove the collar plug because, in his opinion, he would not have been able to remove

the collar plug from the "low" side. In this connection, the Court notes that there is a protuberance, or hook, at the midline of the collar on each of these transformers which the plaintiff would have had to reach around in order to get at the inlet plug if he worked from the "low" side. Pl. Ex. 10. Two other employees of Transformer Service, Houston and Esty, testified on cross-examination by plaintiff's attorney that at times they have worked on transformers from the "high" side. The plaintiff estimated that the inlet plug was four to five inches on the "high" side of the transformer measured from the center edge of it. The plaintiff, who is right-handed, held onto one of the ribs of the barrel of the transformer to get up on the steel platform and then proceeded to unscrew the inlet plug with a crescent wrench. After the plug was removed, he climbed down and climbed back up again and put in the metal adapter and tightened it as far as he could by hand. He then climbed down and returned again with a stilson wrench and used this to tighten the adapter firmly into the collar. He then came down again and went back up with the inlet hose which he attached to the adapter. All of the work on the inlet plug was done. from the "high" side, and the plaintiff climbed down and back up again from the "high" side. Neither Lord nor Locke remonstrated with the plaintiff or warned him that he was getting too close to the high wires when he was working on transformers twenty and twenty-two. The stilson wrench used by the plaintiff was twelve and one-half inches long when closed and fifteen inches long when fully opened. The adapter was one-half to three-quarters of an inch in size. Approximately seven inches of the stilson wrench protruded from the plaintiff's hand as he worked.

The plaintiff started to work on the collar inlet plug of transformer twenty-one in the same manner he had followed in removing the inlet plugs on the collars of numbers twenty and twenty-two. He first removed the inlet plug from the collar of the transformer with a crescent wrench, he then took the plug and wrench down and climbed up again on the "high" side of the platform and screwed in the metal adapter with his right hand as tightly as he could. He then went down again and returned to the platform on the "high" side with the stilson wrench preparatory to final tightening of the adapter. He testified: "My back was probably to the 'high' side lead wire to transformers twenty-one and twenty." He did not look behind him to see how close he was to the bare high wires. As soon as the plaintiff touched the stilson wrench to the adapter, he received a severe electrical shock. Locke testified: "I heard a buzzing sound. I looked up towards the transformers and saw Barrett falling through the middle of the transformers toward the high side; I saw a blaze of electricity, his body lit up like a Christmas tree, like a thousand arcs."

Although counsel for the defendants have suggested through adroit cross-examination of the plaintiff's electrical expert that the plaintiff's right hand or the stilson wrench, or both, struck one of the bare high wires, there is no direct evidence as to how the plaintiff was actually electrocuted. Dr. Greene, who treated the plaintiff at the Concord Hospital, theorized, based on his experience as a physician in treating electrical burns, that the current entered the plaintiff's right hand and exited from his right shoulder. His conclusion was based on the severe burns on the right hand of the plaintiff and the hole burned into the plaintiff's right shoulder. On the other hand, the plaintiff's electrical expert, Dr. Wilson of M.I.T., was of the opinion that the plaintiff's right shoulder either came in direct contact with one of the bare wires or close enough to it (within one-eighth of an inch) to cause an arcing of electricity between the shoulder and the wire at about the same time that the stilson wrench touched the adapter. The plaintiff was thus effectively grounded to a high voltage wire containing an alternating current of 13,-

800 volts. The current from the wire surged into the plaintiff's shoulder as soon as the stilson wrench touched the adapter and because it was an alternating current flowed back and forth through the plaintiff's shoulder, arm, and hand. The gaping hole burned into the plaintiff's right shoulder and the severe burn on the plaintiff's forearm and hand can be used to support either explanation. The important fact is that there had to be contact with one of the high wires before the plaintiff could have been electrocuted. No one disputes this. The Court finds it more probable than otherwise that the plaintiff was electrocuted because his right shoulder came into electrical contact, either directly or by arcing, with one of the high wires that was behind him at the same time that the stilson wrench held in his right hand touched the metal adapter on the collar of the transformer.

## RULINGS

Based on these facts, I first consider the question of Foster Grant's liability. It is well settled under New Hampshire law that the owner of property owes a "duty to maintain reasonable conditions of safety" to business invitees. Butler v. King, 99 N.H. 150, 152, 106 A.2d 385 (1954). In Cartier v. Hoyt Shoe Corp., 92 N.H. 263, 265, 29 A.2d 423, 424, (1942), the Court held that the defendant store owner owed the plaintiff invitee a duty to maintain reasonable conditions of safety, and that the plaintiff "was entitled to place some reliance on the performance of that duty." See also Monier v. Belzil, 97 N.H. 176, 83 A.2d 923 (1951).

It is also clear that the duty of a landowner to keep his premises reasonably safe extends to employees of an independent contractor. This doctrine had its roots in the case of Stevens v. United Gas and Electric Co., 73 N.H. 159, 60 A. 848 (1905). That case involved an employee of an independent contractor who was injured when coming in contact with electrical wires. In that case, as in this, the plaintiff was a common laborer with little or no knowledge of electricity except that he was aware that the wires in question were uninsulated and potentially dangerous. The *Stevens* case, unlike the present one, centered on the fact that the plaintiff did not know whether the electrical power had been turned on. The Court held that, since the defendant knew that the power was on, "a legal duty was imposed upon the defendant toward one so exposed [to the wires], upon its invitation, to use at least ordinary care to protect him from such harm." Id. at 165, 60 A. at 851.

The Court had little difficulty with the principal argument of the defendant that the contractor-employer's full knowledge of the dangerous condition relieved the defendant of any duty to the employee. The Court reasoned, and its reasoning is applicable to the case at bar, that the plaintiff was on the defendant's premises at the invitation of the defendant and the "fact that he was a servant of the contractor in the performance of the work did not relieve the defendant from the performance of any duty it owed him as an invitee." Id. at 168, 60 A. at 852.

The Court characterized the duty of the defendant to the plaintiff as a "nondelegable duty arising from the proprietor's control of the premises * * *." Id. at 169, 60 A. at 853.

[W]here the duty sought to be enforced is one imposed by law upon the defendant, he cannot escape liability by showing that he employed another, over whom he had no control, to perform it for him. Id. at 169, 60 A. at 853, quoting Pittsfield Cottonwear Mfg. Co. v. Pittsfield Shoe Co., 71 N.H. 522, 530, 53 A. 807 (1902).

The Court succinctly set forth the duty owed by the defendant to the employee of an independent contractor:

He was an invitee; and it owed to him the non-delegable duty of using reasonable care to protect him from the concealed danger occasioned by its maintaining upon its wires, near which it

invited him to work, a high voltage of electricity. Id. at 171, 60 A. at 854.

While the Court did not specifically impose a duty on a landowner of maintaining a reasonably safe place to work for employees of independent contractors, its opinion was a definite step in that direction.

In Derosier v. New England Telephone & Telegraph Co., 81 N.H. 451, 130 A. 145 (1925), the Court held that the:

> [n]eglect of a third party [the non-party co-owner] to take measures to protect the plaintiff from the results of the defendant's fault does not excuse the defendant. Id. at 460, 103 A. at 151.

The Court imposed the "positive duty to use due care to make the situation reasonably safe. * * *" Id. at 468, 130 A. at 155. See also Nashua Gummed & Coated Paper Co. v. Noyes Buick Co., 93 N.H. 348, 41 A.2d 920 (1945).

■ I recognize that the Stevens case preceded the enactment of any Workmen's Compensation Act, but Workmen's Compensation has not altered or lightened the landowner's duty in any way. Although the employee must rely on the Act for relief and give up his common law right of damages against his employer, Reed v. New England Telephone & Telegraph Co., 175 F.Supp. 409 (D. N.H. 1958), the Act specifically gives the employee a right to proceed against third parties for damages. NH RSA Ch. 281:14. It is established law in New Hampshire that the Workmen's Compensation statute is not intended and cannot be used to foreclose an employee's rights against third parties. See Merchants Mutual Casualty Co. v. Tuttle, 98 N.H. 349, 101 A.2d 262 (1953). In the case of Butler v. King, 99 N.H. 150, 106 A.2d 385 (1954), decided after the enactment of the Workmen's Compensation Act, the Court held that the employee of a subcontractor could recover damages from the general contractor even though he had received Workmen's Compensation from his employer. The same rule is certainly applicable where the plaintiff is an employee of an independent contractor. Most importantly for the determination of the issues in the case at bar, the Court, in Butler, held that the general contractor "had a duty to maintain reasonable conditions of safety. * * *" Id. at 152, 106 A.2d at 387.

The Butler case explicitly increased the duty established in Stevens from that of requiring a warning to a continuing duty to maintain the premises in a reasonable condition of safety. This duty is consistent with the normal duty owed to a business invitee. In Butler the Court made no distinction between an employee of a subcontractor and an invitee, and there should be none since both are on the premises at the express invitation and for the benefit of the owner. This view is supported by the language in Lane v. Groetz, 108 N.H. 173, 230 A.2d 741 (1967). There the Court stated:

> Whether [the plaintiff] had the status of an employee of [the defendant], or of an independent contractor, it was the duty of [the defendant], or of those acting with authority on [defendant's] behalf, to furnish [plaintiff] with a reasonably safe place to work. Id. at 175, 230 A.2d at 743.

See also Colby v. Treisman, 85 N.H. 19, 20, 153 A. 469 (1931). This reasoning is also found in the Restatement of Torts, Second, Section 343A dealing with known or obvious dangers. Comment f. to that section provides in part:

> There are, however, cases in which the possessor of land can and should anticipate that the dangerous condition will cause physical harm to the invitee notwithstanding its known or obvious danger. In such cases the possessor is not relieved of the duty of reasonable care which he owes to the invitee for his protection. This duty may require him to warn the invitee, *or to take other reasonable steps to protect him, against the known or obvious condition or activity, if the possessor has reason to expect that the invitee will nevertheless suffer physical harm.* (Emphasis added.)

Since the area where the plaintiff was working was extremely dangerous, the defendant could reasonably expect that physical injury might result if some safety precautions were not taken. The duty that Foster Grant owed the plaintiff, therefore, was a duty to maintain its transformers in a condition that was reasonably safe. With this framework, I now proceed to the question of whether or not Foster Grant was negligent.

The defendant actually knew, based on past observation, that employees of Transformer Service worked on transformers in close proximity to the bare high voltage wires. Foster Grant also knew that the reconditioning work on the transformers was performed when the transformers were energized; this was the reason Foster Grant retained Transformer Service, Inc. I do not find that Foster Grant had any duty to de-energize the transformers during the oil reconditioning work because this would be contrary to the oral agreement between it and defendant Transformer Service. I do find, however, that Foster Grant was negligent because of its failure to insulate the bare high voltage wires. Foster Grant had to consider that men would be working on the transformers in a highly dangerous area, and it had a duty to make the area reasonably safe for such work. No reason has been advanced by Foster Grant as to why the bare high voltage wires were not insulated in their entirety so as to reduce to a minimum the chance of electrocution. Certainly, one of the largest manufacturers of plastics and sunglasses in the world could afford the minimal economic cost of such insulation.

The defendant introduced evidence that it was not the practice of other manufacturers who use transformers to insulate the lead-in wires. The evidence was not conclusive that lead-in wires were not generally insulated but, even if it were, that would not affect the requisite standard of care. The words of Judge Learned Hand in The T. J. Hooper, 60 F.2d 737 (2nd Cir. 1932), cert. denied, Eastern Transportation Co. v. Northern Barge Corp., 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932), are particularly relevant.

> Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It [business] never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission. Id. at 740.

I further find that Foster Grant was negligent because it failed to relocate the inlet plugs from the "high" side of the collar to the "low" side. As with the bare wires, no reason was given for neither turning the collar nor putting additional inlet plugs on the "low" side of it. Foster Grant was content to maintain the transformers in the same condition that they had been in when they were purchased. While such an attitude is understandable, it does not meet, in the opinion of this Court, the reasonable standard of care to which Foster Grant must be held. It knew that employees of Transformer Service, Inc., would be working on the transformers from time to time and it knew that they would be doing so under conditions which meant that any contact with the high voltage wires would mean serious injury or death by electrocution. Under these circumstances, it is not unreasonable to hold that Foster Grant had a duty to either insulate the high voltage wires or move the inlet plug to the "low" side so that the oil in the transformers could be reconditioned safely and easily.

I also find that Foster Grant was negligent through its electrician, Lord, who failed to stay in the enclosed area and observe the work of the plaintiff and warn him about getting too close to the high voltage wires. Mr. Lord had been sent into the danger area on prior occasions to watch Transformer Service's employees at work. Both the plaintiff and the man with whom he was working,

Locke, relied on Lord to warn them if they came too near the high voltage wires. Further, most of the other companies for whom Transformer Service did work assigned a man to observe and caution its employees as to the proximity of the high voltage wires. This was a sensible and reasonable precaution which Transformer Service employees had a right to expect and rely on. It was negligent for Lord to leave the danger area before the plaintiff had completed work on transformer twenty-one.

Foster Grant interposes two defenses, either of which bar the plaintiff if they apply. The first is the assumption of the risk, and the second is contributory negligence. The position of Foster Grant is that the plaintiff assumed the risk by undertaking the work since he knew that the wires were live and dangerous. This defense cannot stand because, in New Hampshire, the doctrine of assumption of the risk applies only to common law actions by an employee against his master. Butler v. King, *supra*; Ayers v. Gordon, 94 N.H. 30, 45 A.2d 656 (1946); Papakalos v. Shaka, 91 N.H. 265, 18 A.2d 377 (1941); and Williamson v. Derry Electric Co., 89 N.H. 216, 196 A. 265 (1938). The plaintiff cannot, under these facts be found to be an employee of Foster Grant. Foster Grant had no control over the manner in which the work was accomplished and no control over the employee plaintiff. *Respondeat superior* does not apply since it:

> does not extend to the case of an independent contractor, to whom the execution of a work is committed without any control or power of discretion being reserved on the part of the employer as to the manner of executing the work. Paro v. Whitefield Savings Bank and Trust Co., 77 N.H. 394, 396, 92 A. 331, 332, (1914), quoting Carter v. Berlin Mills Co., 58 N.H. 52, 53–54 (1876).

Mr. Lord's function cannot be equated with supervision or control since it was purely a precautionary measure for safety purposes only. See also Butler v. King, *supra*, where the Court refused to characterize an employee of a subcontractor as the servant of a general contractor.

The second line of defense, and the one that poses the most difficulty, is whether the plaintiff was contributorily negligent. It is the defendant's position that the contributory negligence of the plaintiff consisted of three elements: (1) that he knew the "high" side was dangerous; (2) that he approached the transformer from the "high" side; and (3) that he did not look behind him to see how close he was to the high voltage wires. This was the only credible evidence introduced by the defendant to meet its burden of proving contributory negligence. These facts, however, combined with the fact that the accident happened, do not establish that the plaintiff was negligent. To hold that working on a transformer from the "high" side is conclusive evidence of negligence would be unrealistic since it would mean that no work could be done on the "high" side of an energized transformer. There was no evidence of such a rule being in effect and enforced either by Foster Grant or Transformer Service. Moreover, this approach completely overlooks the question of whether or not the plaintiff was unreasonable in approaching and working on the transformer from the "high" side. The applicable test, under New Hampshire law, is whether the defendant heedlessly encountered a known danger. There is no doubt that, under New Hampshire law, the heedless encounter of a known danger bars recovery. In Butler v. King, 99 N.H. 150, 106 A. 2d 385 (1954), the Court stated:

> the plaintiff is precluded from recovering damages if he received his injuries as a result of encountering a known danger to which he paid no heed. Id. at 152, 106 A.2d at 387.

The Court, however, held specifically that:

> the fact that a condition is obvious— *i. e.*, it would be clearly visible to one whose attention is directed to it—does not always remove all unreasonable

danger. Id. at 152, 106 A.2d at 387, quoting James, Tort Liability of Occupiers of Land: Duties Owed to Licensees and Invitees, 63 Yale L.J. 605, 625 (1954).

■ The question, therefore, becomes whether the plaintiff was heedless or unreasonable in working on the transformer from the "high" side. The fact that the plaintiff was fully aware that contact with the bare high voltage wires would result in severe electrical shock does not prove, without more, that he was heedless. In Wright v. Connecticut Valley Electric Co., 106 N.H. 113, 206 A.2d 103 (1964), the Court held: "it is established law that of itself 'incurrence of a known danger is not the legal equivalent of negligence.'" Id. at 115, 206 A.2d at 104, quoting Piateck v. Swindell, 84 N.H. 402, 404, 151 A. 262 (1930). In fact, the Court stated explicitly: "There is no fault if a known danger is carefully incurred." Id. The plaintiff testified that he was careful while working. Locke testified that the last time that he saw the plaintiff on transformer twenty-one, he was in a safe position. It is human nature to perform a job in the manner that is easiest and most convenient. I also recognize that day-to-day exposure to danger dulls one's awareness of the ever present risk of injury. These considerations cannot be overlooked in the determination of whether or not the plaintiff was contributorily negligent. The Restatement of Torts, Second, recognizes this. Illustration 3 to section 343 states:

> The A Drug Store has a soda fountain on a platform raised six inches above the floor. The condition is visible and quite obvious. B, a customer, discovers the condition when she ascends the platform and sits down on a stool to buy some ice cream. When she has finished, she forgets the condition, misses her step, falls, and is injured. If it is found that this could reasonably be anticipated by A, A is subject to liability to B.

There is no doubt that it was easier for the plaintiff to remove the inlet plugs in the collars from the "high" side of the transformer. The position of the inlet plugs is clearly shown on the photographs introduced as exhibits and a man of the plaintiff's stature could do the work easier from that side. The question is whether or not the plaintiff's approach from the "high" side and his working with his back to the wires violated the standard of care of the average man of ordinary prudence under these circumstances. The fact that it was not the safest position is not the criterion unless it can be shown that this was a heedless encounter of a known danger. Evidence from two other employees called by the defendant Foster Grant, Mr. Houston and Mr. Esty, was to the effect that at times they too had approached transformers from the "high" side when reconditioning oil.

■ The most prudent and careful workman may not have approached the transformer from the "high" side, but the standard of care is not that of the most prudent and most careful workman. The standard is determined by reference to the conduct of the average workman of ordinary prudence under the circumstances. Under the circumstances of this case, I find that the plaintiff's working on the "high" side of the transformer was not a heedless encounter of a known danger. One of the circumstances that justifies plaintiff's action was that the position of the inlet plug made it easier to work on the transformer from the "high" side rather than from the "low" side. Another circumstance was the fact that this approach had been used twice before in the presence of Mr. Lord, the man assigned to watch the plaintiff and caution him if he got too close to the high wires. The failure of Mr. Lord to warn the plaintiff against working on the "high" side or to urge him to work on the "low" side, combined with the fact that the plaintiff had worked from the "high" side on the other transformers that day, are grounds for holding that the same course of conduct as to transformer twenty-one was not negligent.

It might be argued that, since the plaintiff did not attempt to remove the vent plug located on the cover of transformer twenty-one because it was too close to the bare high voltage wires, he should have followed the same procedure as to the inlet plug. That argument overlooks the salient point that there was an alternative way of venting transformer twenty-one, *i. e.*, by removing the sight gauge. In order for the oil conditioning of transformer twenty-one to proceed, the inlet plug on the collar had to be removed. There was no alternative plug on the "low" side of the transformer.

I rule that the doctrine of assumption of the risk does not apply and find that the plaintiff was not contributorily negligent.

## DAMAGES

The basic question on the issue of damages expressed in the vernacular of the trial lawyer is: How much is the loss of a good right forearm worth?

 Since there is no serious dispute as to the facts relative to the issue of damages, a bare recital of only the most important is necessary. The plaintiff was thirty-one years of age at the time of the accident. He had no particular trade or skill. His high school education had been completed only after he entered the Armed Services. He was a person who earned his livelihood primarily by physical work requiring the use of his arms and hands. He was right-handed. Prior to the accident, he was in excellent health and physically active. For the twelve weeks immediately preceding the accident, he averaged one hundred thirty-eight dollars per week as gross pay. He was out of work from the day of the accident until September 1, 1968. He went to work as a shipping clerk as of the first of September, 1968, and during the first six months of 1970, averaged between one hundred five dollars and one hundred ten dollars per week in gross pay.

As a result of being electrocuted, the plaintiff received first, second, and third degree burns of his right hand, wrist, elbow, forearm, and right shoulder. The hospital records of the Concord Hospital (Pl. Ex. 2) need little explanation or embellishment. They reveal fully the extent of the plaintiff's injuries, the medical treatment he received and are the basis for an understanding of the pain and suffering that the plaintiff must have endured. These records show, among other things, that the doctors performed sixteen or seventeen surgical operations on the plaintiff's hand, wrist, and forearm, starting with the amputation of his right thumb and ending with the amputation of his right forearm. The plaintiff also received a severe, but not permanently disabling, burn to his right shoulder.

In determining the amount of damages to be awarded, I have taken into consideration the following factors:

1. The scope and extent of the injuries;

2. The probable life expectancy of the plaintiff which I find to be forty years;

3. The past, present, and probable future pain and suffering of the plaintiff;

4. The permanent effect that the loss of his right forearm will have on the plaintiff for the balance of his life, including loss of earning capacity, the physical inconvenience and difficulty that the plaintiff will have in day-to-day living, and the changes in the plaintiff's manner of living forced upon him by the loss of his right forearm;

5. The medical expenses incurred by the plaintiff;

6. The probable future medical expenses that will be incurred by the plaintiff, including the cost of replacing the parts of the prosthesis that the plaintiff will have to use for the rest of his life; and

7. The actual loss of wages during the period that the plaintiff was unable to work.

I have not taken into consideration any of the following factors:

1. Embarrassment and shame, because there was no competent medical or psychiatric testimony on this point and, particularly, as to what effect they would have on the plaintiff;

2. Pain and suffering for the so-called "phantom phenomenon," because Dr. Record testified that he did not know and could not prognosticate whether the plaintiff would experience this phenomenon. I also find, on the basis of Dr. Record's testimony, that it is not probable that the plaintiff will suffer "neuroma" of his stump;

3. Loss of investment relative to the planned purchase of a home, because I find there was no such loss, since the payments made were rental payments on a month-to-month basis. In this connection, I also find that the claimed loss due to the sale of furniture was not properly proven and too speculative;

4. Damages for the loss of the plaintiff's car as a result of an accident which took place because he was unable to steer correctly with his "hook" prosthesis, since such damage is not a reasonably foreseeable result of the injury; and

5. The fact that he is the father and has sole custody of minor children. Damages are to be awarded to the plaintiff himself and the number of children for whom he is responsible is immaterial. Nor have I taken into consideration any mental anxiety and worry that he had relative to the future of his children.

I find that fair and adequate damages in this case are $260,826. There will be deducted from this award the amount of $8,067.95 which is due the Workmen's Compensation carrier under its lien.

## THIRD-PARTY ACTION

The third-party action is predicated on three basic allegations:

One, that the defendant Foster Grant relied upon the representations of the independent contractor, Transformer Service, Inc., that its employees were competent to service the transformers without special precautions necessary on the part of Foster Grant;

Two, that Transformer Service, Inc., expressly and impliedly warranted that its employees could do the work in a competent and skilled manner; and

Three, that there was an express or implied indemnity agreement between Foster Grant and Transformer Service, Inc., under the terms of which Foster Grant would be reimbursed for any damages incurred during the oil reconditioning process.

There is no evidence that the representations or warranty, if any, were intended to cover this type of situation. Clearly, they only applied to the work to be done, not to accidents occurring during the work process. As I have pointed out on pages 790, 791, and 792, *supra*, the duty of Foster Grant to the plaintiff to take reasonable precautions was non-delagable and it cannot be shifted to the independent contractor through the device of a third-party action.

Further, even if Transformer Service, Inc., was negligent in failing to properly train and instruct its employees, such negligence cannot be the grounds for reimbursement because, under New Hampshire law, there is no contribution among joint tortfeasors.

The final question is whether or not Transformer Service, Inc., is liable to the defendant Foster Grant on an express or implied indemnity agreement. I find that there was no written indemnity agreement entered into between Foster Grant and Transformer Service, Inc. The "Regulations Governing Contractors at Foster Grant, Inc.," Exhibit

33, was never received by Transformer Service, Inc. Even if these Regulations had been received, they do not constitute an indemnity agreement in the sense that Transformer Service, Inc., agreed to indemnify Foster Grant for the consequences of its negligence to one of Transformer Service's employees.

The question then becomes whether, under these facts, an oral or implied indemnity agreement can be found. In Reed v. New England Telephone & Telegraph Co., 175 F.Supp. 409 (D.N.H. 1958), the Court denied a motion to join the employer stating:

The majority of the cases have decided that the policy, or even express provisions, of the Workmen's Compensation Law of the various states would be circumvented if a tortfeasor were allowed to recover from an employer covered by the law on account of injuries suffered by an employee. Id. at 411.

The Court declined to grant indemnity because no contractual right to indemnity was alleged. This holding is not affected by Revallion v. Herbert & Sons Auto Sales, Inc., 248 F.Supp. 123 (D. N.H.1965), because there the Court found that the defendant's motion to join the employer as a third-party defendant alleged a "special relationship" by "implication from a contract" between the defendant and the third-party defendant. Id. at 124.

Here no right of indemnity can be implied from the alleged contract. Implication of an indemnity agreement where Workmen's Compensation is involved should be found only on clear proof. It would be contrary to the intent and purpose of the New Hampshire Workmen's Compensation Act to make the employer liable for the employee's damages under these facts. The only evidence presented on an indemnity agreement here was the "Regulations Governing Contractors." Ex. 33. As previously noted, this is not an indemnity agreement on its face nor was there any evidence that it was intended by the parties to be an indemnity agreement.

I find for the defendant Transformer Service, Inc., in the action against it by Foster Grant.

So ordered.

## ON DEFENDANT FOSTER GRANT'S MOTIONS ON REHEARING

The defendant Foster Grant has moved to set aside the verdict, for a judgment notwithstanding the verdict, or for a new trial. The only matter I consider here is th impact of Wentworth Hotel, Inc. v. F. A. Gray, Inc., N.H., 272 A.2d 583 (Dec. 1, 1970), decided after my original opinion, on the third-party action against Transformer Service, Inc. I am of the opinion that the *Wentworth* decision does not affect my decision.

Defendant Foster Grant argues that the *Wentworth* decision contravenes my holding in the third-party action. At the outset, it should be noted that the *Wentworth* case was decided on a motion to dismiss. The action by Foster Grant against Transformer Service, Inc., was not dismissed, but the issue of an express or implied indemnity agreement was fully litigated.

*Wentworth*, as applied to this case, holds that an employer, whose employee is injured on a landowner's premises, *may* be liable in indemnity for the damages assessed against the landowner for breach of his non-delegable duty to maintain his premises in a reasonably safe condition *if the employer has breached his express or implied warranty to perform the work in a workmanlike manner*; *i. e.*, the contract for services "implies a duty to indemnify the other party to the contract against losses resulting from breach of the obligation to him." *Wentworth, supra,* at 585.

Here there was no breach of the implied warranty to perform the work in a workmanlike manner. I found as fact that "Mr. Harvey of Foster Grant did observe the work of the Transformer Service employees on the transformers over the years between 1954 and 1968, and considered the employees to be competent and efficient." *Supra*, page 787.

Transformer Service's only contractual obligation was to check the oil in the transformers and recondition it if instructed to do so by Transformer Service. Other than reconditioning the oil, Transformer Service had no obligation to inspect, repair, or maintain the transformers or wires. In fact, Mr. Harvey was "in charge of maintenance" of Foster Grant's "electrical installations." *Supra*, at 786.

Foster Grant argues that Barrett's co-worker, Locke, did not perform his job in a workmanlike manner because he had an obligation or duty to provide safety supervision for Barrett. This claim ignores the facts. Locke's primary responsibility was to supervise the reconditioning process. To do this, he had to read the gauges in the truck. Locke "attached the suction hose to the outlet plug and then supervised the reconditioning process in the truck." *Supra*, at 788. Locke's job required him to be in the truck most of the time so as to be able to read the gauges. Safety supervision was assumed by Mr. Lord, Foster Grant's employee. Foster Grant sent Mr. Lord to watch the plaintiff and Locke to "see that they did not get too close to the high wires." *Supra*, at 788. It is elementary tort law that one who undertakes a duty must use reasonable care in performing that duty.

The only warranty that Transformer Service was required to meet was to recondition the oil in a workmanlike manner. As indicated above, Locke performed his function in a workmanlike manner. I found that Barrett's conduct did not constitute contributory negligence, and it follows, therefore, that Barrett performed his work in a reasonable and workmanlike manner. Since there was no breach of an implied warranty to recondition the oil in a workmanlike manner, there can be no right of indemnity in favor of Foster Grant.

All post-trial motions of Foster Grant are denied.

So ordered.