RONALD A. BARRETT *vs.* TRANSFORMER SERVICE, INC.
(and a companion case[1]).

Essex. January 5, 1978. — March 29, 1978.

Present: QUIRICO, BRAUCHER, KAPLAN, & ABRAMS, JJ.

*Workmen's Compensation Act,* Injuries to which act applies, Foreign
employee, Award of compensation in two States. *Res Judicata.*

Where an insurance policy providing workmen's compensation coverage
to an employer was confined in its body to liability pursuant to the
laws of New Hampshire and New York was dealt with by the insurer
as a policy without Massachusetts coverage, and was not endorsed to
extend coverage to Massachusetts until six months after an employee
suffered injuries in an accident in Massachusetts, and where a further
endorsement, with an attempted retroactive dating, was provoked by
the employee's commencement of a tort action against the employer,
and was actually issued after the expiration of the policy, the employer
was not an insured within the meaning of G. L. c. 152, § 67. [706-714]
In a tort action by an employee against his New Hampshire employer for
injuries suffered in an accident while performing work for his employ-
er at a plant in Massachusetts, the amount of a judgment in a Federal
court in the employee's favor against the Massachusetts company did
not fix the amount of his recovery against his employer. [714-716]

TORT. Writ in the Superior Court dated December 4,
1968.

The action was tried before *Bennett,* J.

BILL IN EQUITY filed in the Superior Court on August 30,
1972.

The suit was heard by *Bennett,* J.

The Supreme Judicial Court granted a request for direct
appellate review.

*Raymond J. Kenney, Jr.,* for Transformer Service, Inc. &
another.

_____

[1] Employers Mutual Liability Insurance Company of Wisconsin *vs.*
Ronald A. Barrett and Transformer Service, Inc.

*Katherine Liacos Izzo* (*Roger Phillips* of New Hampshire with her) for Ronald A. Barrett.

KAPLAN, J. 1. *Summary statement.* On February 5, 1968, Ronald A. Barrett, repairman, and Arthur Locke, foreman, both employed by Transformer Service, Inc., a New Hampshire corporation, were directed by their superior to go from Concord, in that State, where the corporation's office was located, to the plant of Foster Grant Co., Inc., in Leominster, Massachusetts. They were to carry out a job characteristic of the work done by Transformer Service under contract for others in Massachusetts as well as New Hampshire. This was to recirculate and recondition the oil in transformers while the transformers were receiving electrical current and remaining in operation. The two men arrived at Foster Grant that day and proceeded with their assignment. In the temporary absence from the immediate location of Locke and of an engineer employed by Foster Grant who used to keep watch on the process, Barrett attempted to fix an adapter to one of the transformers, approaching his task, apparently, from the higher-voltage side. He unwittingly touched a bare wire leading into the transformer, and, besides extreme electric shock, suffered burns which required repeated surgery and resulted in amputation of his right forearm.

In December, 1968, Barrett brought a tort action in the Superior Court against Transformer Service[2] under G. L. c. 152, § 66. This statute, taken together with § 67, applies where an employer should have, but has not, become insured for workmen's compensation, and in that case casts liability on the employer, with usual defenses eliminated, for injuries to his employees arising in the course of the employment.[3] In August, 1972, while the action was on the

---

[2] Foster Grant was brought in as third-party defendant and in turn impleaded Transformer Service and Employers Mutual as fourth-party defendants, but a motion of Foster Grant for separate trial was allowed, and the docket does not show any subsequent development of these claims.

[3] Text of these sections is at n.8 below.

calendar pending trial, Employers Mutual Liability Insurance Company of Wisconsin (Employers Mutual) commenced a suit in the same court, joining Barrett and Transformer Service, to secure a declaration that a policy it had issued to Transformer Service did provide workmen's compensation insurance covering the accident and satisfying § 67 — in which event the tort action under § 66 would fail. After trial without a jury which began on February 7, 1977, the judge entered judgment declaring that the accident was not covered. The tort action was then promptly tried to a jury and resulted on February 25 in a verdict for Barrett against Transformer Service, on which judgment entered.

On the present appeals,[4] we consider contentions as follows. Employers Mutual contends that the declaration made below was wrong and that the contrary should have been declared. Barrett contends that as a matter of "collateral estoppel," the higher amount of a judgment in his favor in an action based on the same accident, brought by him against Foster Grant in the Federal court in New Hampshire, should have been held to fix the amount of his recovery against Transformer Service.[5] We hold that both contentions fail, and we affirm the judgments.

2. *The declaratory action.* (a) *The proof.* Promptly after the event at Foster Grant, Transformer Service filed the customary accident report with the New Hampshire workmen's compensation authorities. Transformer Service was going on the correct assumption that its liability under the

---

[4] By Transformer Service and Employers Mutual in respect to the declaratory action; by Transformer Service as to the tort action, with Barrett cross appealing. We granted applications for direct appellate review.

[5] The contentions just summarized are framed, as to the declaratory action, by objections of Transformer Service and Employers Mutual to the judgment based on findings and rulings; and as to the tort action, by objections of Transformer Service to the denial of its motions for a directed verdict, judgment n.o.v., and a new trial, and by the objection of Barrett to the denial of his motion regarding damages. Barrett also objected to the denial of his request for trial by jury of the issue whether there was workmen's compensation coverage, but he makes no argument on that point here.

New Hampshire workmen's compensation law extended to this accident, and that its policy with Employers Mutual covered the liability. Toward the end of February, 1968, Barrett's attorney called the New England office of Employers Mutual at Belmont, Massachusetts, and inquired whether they would pay Massachusetts rather than New Hampshire compensation and benefits, the Massachusetts rates being more favorable. The insurer wrote to him on March 26 that "[i]t is our position that this matter should be handled under the New Hampshire Workmen's Compensation Law," but added (somewhat enigmatically), "[i]t is not to say that it cannot be filed under the Massachusetts Workmen's Compensation Law." Compensation was in fact being paid at New Hampshire rates.

In early May an application for compensation was made on Barrett's behalf to the Massachusetts Division of Industrial Accidents. This drew a letter on May 20 (reiterated on May 27) from the insurer to counsel for Barrett stating that "our policyholder [Transformer Service] has no Massachusetts Coverage and this employee is hired, lives, is paid and supervised out of Concord, New Hampshire and would fall under the New Hampshire compensation benefits."

On October 8 a pre-trial conference was held at the Massachusetts Industrial Accident Board with counsel present representing Barrett and the insurer. The attorney appearing for the insurer stated that "our coverage was not for Mass." and that he "did not know whether the employer had any coverage in Mass. [referring presumably to a policy that might have been issued by another insurer] and rather doubted that he did. . . . We do have coverage in NH."

On December 4, 1968, Barrett commenced the Superior Court tort action, and the Federal action was started about the same time.

In mid-January, 1969, the insurer informed counsel for Barrett that a mistake had been made, that it now conceded Massachusetts (as well as New Hampshire) coverage. Barrett's counsel replied that he could not accept that the insurer's previously reiterated position had been in error. He

suggested that the insurer had been trying to maneuver Barrett into the cheapest schedule of payments and that its present tactic was due to the filing of the tort action. He added that he had reason to believe that the insurer would be responsible to Transformer Service under a general liability coverage for any judgment that might be recovered in the tort action.[6] Counsel proposed to and did continue with that action.

The foregoing is the external record, so to speak — the matter as seen by one representing the employee. There was evidence, also, of facts and behavior internal to the insurer. The policy issued to Transformer Service for the period January 1, 1968, to January 1, 1969 (renewal of a policy first placed in 1958), was a standard workmen's compensation form. The third "declaration" stated: "Coverage A of this policy [to pay workmen's compensation benefits] applies to the workmen's compensation law . . . of each of the following states: New Hampshire, New York." Stapled to the policy was a sheet entitled "Universal Endorsement" from which we quote three paragraphs: "1. The obligations of Coverage A — Workmen's Compensation — of the policy shall apply to the United States Longshoremen's and Harbor Workers' Compensation Act and the workmen's compensation law of any state, district, or territory of the United States except Nevada, North Dakota, Ohio, Washington, West Virginia and Wyoming. . . . 10. In those states where the use of lawfully approved policy forms is required, . . . this endorsement shall serve only as a binder for coverage pending . . . issuance of a separate policy . . .. [Unnumbered] All other provisions and conditions remain unchanged."

On August 1, 1968 — after the disclaimers of Massachusetts coverage made to Barrett's counsel in May — the insurer issued an Endorsement No. 2 to the policy stating that there had been "[n]o previous Massachusetts coverage" and providing that coverage A of the policy should apply to

---

[6] The Employers Mutual policy received in evidence had a "Coverage B — Employers' Liability" with a limit of liability of $100,000.

Massachusetts. This was stated to be effective from June 25, 1968. On July 31, 1968, the particular policy (as now amended) was first filed with the Massachusetts Division of Industrial Accidents.

The insurer's position at the pre-trial conference in October, 1968, again disclaiming Massachusetts coverage, was not casual. It was taken, apparently, at the direction of the senior lawyer at the Belmont office after Belmont had been prodded by the home office underwriting department at Wausau, Wisconsin, to consider fully the question of coverage.

Commencement of the tort action on December 4, 1968, was followed by the arrival in Belmont of a claims officer from the home office. She examined the file, conferred with the local people, and wrote a memorandum dated January 7, 1969: "In our discussions we clarified the status of coverage in Massachusetts. The Universal endorsement . . . provided Massachusetts coverage on the effective policy date 1/1/68. Issuance of the Massachusetts endorsement was a formality serving the purpose of eliminating question that Massachusetts coverage existed." The reference here was presumably to Endorsement No. 2, of which the effective date, however, was June 25, 1968. On January 21, 1969, the insurer issued an Endorsement No. 3 purporting to amend Endorsement No. 2 thus: "Effective date of Endorsement to read 1 1 68." A later mailgram from home office-underwriting to Belmont-underwriting, "Re Universal Endorsement," indicated that the endorsement had "never been filed in all states," as "[i]t has been the feeling that the endorsement does not affect any coverage in a state listed in item [i.e. declaration] 3 of the policy and would therefore not have to be filed." Here "filed" may carry the meaning of approval by governmental authority. In any event, it does not appear that the form of Universal Endorsement had been approved by the Commissioner of Insurance under G. L. c. 152, § 55, first paragraph, as amended by St. 1934, c. 137, § 1.[7]

[7] This paragraph provides: "No policy of workmen's compensation insurance shall be issued or delivered until a copy thereof has been filed

(b) *Analysis.* In the first place, despite the insurer's suggestions in its correspondence and other dealings with counsel that the accident to Transformer Service's employee did not fall under the Massachusetts workmen's compensation law ("the employee is hired, lives, is paid and supervised out of Concord"), the fact was otherwise. In the circumstances, a 1956 precedent, *Lavoie's Case,* 334 Mass. 403, cert. denied, 352 U.S. 927 (1956), was dispositive. It indicated that the Massachusetts law gave protection for the accident on the Massachusetts job, the employee, however, being required to allow credit for any workmen's compensation benefits received under the New Hampshire law which also provided protection. We understand that this proposition is now agreed.

Thus the employer Transformer Service was bound to take steps to become "insured" — stand ready to provide workmen's compensation benefits under Massachusetts law — or suffer exposure under §§ 66 and 67.[8] See *Tracy* v. *Cambridge Junior College,* 364 Mass. 367 (1973); *Price* v.

---

with the commissioner of insurance at least thirty days prior to such issue or delivery, unless before the expiration of the thirty days the said commissioner shall have approved the form of the policy in writing, nor if the commissioner notifies the company in writing that in his opinion the form of said policy does not comply with the laws of the commonwealth, specifying the reasons for his opinion; provided, that upon petition of the company the opinion of the commissioner shall be subject to review by the supreme judicial court."

[8] Section 66, as amended through St. 1971, c. 700, § 1, provides: "In an action to recover damages for personal injury or consequential damages sustained within or without the commonwealth by an employee in the course of his employment or for death resulting from personal injury so sustained it shall not be a defense: 1. That the employee was negligent; 2. That the injury was caused by the negligence of a fellow employee; 3. That the employee had assumed voluntarily or contractually the risk of the injury; 4. That the employee's injury did not result from negligence or other fault of the employer, if such injury arose out of and in the course of employment."

Section 67, as amended through St. 1953, c. 656, § 2, provides in part: "Section sixty-six shall not apply to actions to recover damages for personal injuries received by employees of an insured person or a self-insurer."

*Railway Express Agency, Inc.*, 322 Mass. 476, 479 (1948). We agree with the judge below that the employer had not secured the status of an insured within the meaning of § 67 in respect to the accident on February 5, 1968.

Out of concern that employees shall get their due compensation according to Massachusetts requirements, the form of policy must be approved by the Commissioner of Insurance, and such a policy must have been entered into and made accessible to employees as the intended beneficiaries. Until these things have been done, employees have not achieved practical protection.

Here the policy written for the insured was confined in its body to liability pursuant to the laws of New Hampshire and New York, was dealt with as a policy without Massachusetts coverage, and made no official contact with Massachusetts until a half year after the accident. At that time Endorsement No. 2 was issued extending coverage to Massachusetts. It stated that there had been no antecedent Massachusetts coverage.[9] Endorsement No. 3, with an attempted retroactive dating, was provoked by the commencement of the tort action, and was actually issued after the expiration of the policy. Number 3 could only be an odd way of asserting that a universal endorsement had been effective as Massachusetts insurance from the beginning, but that endorsement, whatever its possible meaning or application, had been neither approved nor filed at the time of the accident.

The judge, referring to the whole transaction recounted in (a) above, explained forcefully the vice that would be involved in holding that there was an "insured" on the scene here all along within § 67. It would open a potentiality not only for confusion but abuse. The employee is first told that he has no compensation claim under the law of State X, that no insurance is in force there, and that he must rely for coverage on the inferior benefits of State Y. And in fact the

---

[9] When Endorsement No. 2 was issued, a premium rate was set ($2.23 per $100 of remuneration).

insurer has made no relevant filing in State X. The employee in many cases would accept the insurer's statement and in any event would have trouble pursuing the matter further. Pressures such as delaying payment may be exerted to induce acquiescence. Only where the employee persists unpleasantly in discovering and asserting his rights does the insurer make any corrective move. It claims to be able at the last moment to confess coverage and render the employer an "insured" under the law of State X by referring to a universal endorsement not previously brought to light — thereby it might avert a tort judgment against the employer for which it could be responsible under other coverage or by operation of other principles. We think that allowing such a convenient transmogrification would be faithful neither to the words nor purpose of § 67.

We add two incidental observations. First, even if the universal endorsement had been made known and been in the picture from the beginning, there is some room for argument that on the particular facts it should not be read to apply to this accident. The insurer and employer in their brief say the endorsement was "to ensure that an employer will have insurance coverage in the event that he incurs an obligation in a state in which a risk was not anticipated when the policy was written." But on the present record, work by Transformer Service in Massachusetts was not unexpected but expectable and had in fact occurred over a period of time. (See also the District Court's opinion in the New Hampshire case, *Barrett* v. *Foster Grant Co.*, 321 F. Supp. 784, 787 [D.N.H. 1970].[10])

---

[10] The insurer derives no support from *Liberty Mut. Ins. Co.* v. *Gordon*, 94 Ill. App. 2d 90 (1968), where there was a recovery on an "all states endorsement," somewhat comparable to a universal endorsement, in a situation not described as presenting any of the features we hold significant here, and not involving statutes such as G. L. c. 152, §§ 55, 66, and 67. And see *Shires* v. *Wrought Iron Range Co.*, 339 P.2d 105 (Okla. 1959). The Illinois court said, interestingly, that the all States endorsement was "intended to provide for possible exposure to liability under state workmen's compensation laws to which the insured does not expect to be subject." *Id.* at 94. If the same can be said of the intent of the univer-

Second, although the mere existence of a universal endorsement in the insurer's file did not render the employer an insured under § 67, the employee could, if he chose, assert plausibly that he was entitled to stand on the endorsement and claim compensation under the statute. That right might exist under § 55, second paragraph.[11] But the employee could not be obliged to essay that route and could act under § 66 instead. Comparable results as to employees' remedies are not unusual when there is a failure to comply with a requirement of securing compensation coverage. See *Hall* v. *Burton,* 201 Cal. App. 2d 72 (1962) (and note *Meerdink* v. *Ott,* 307 F.2d 721, 723-724 [3d Cir. 1962]); *Sharmar Nursing Home* v. *Industrial Comm'n of Colo.,* 160 Colo. 197 (1966); *May* v. *Williams,* 494 S.W.2d 289 (Mo. 1973); *Fisher* v. *Independence,* 370 S.W.2d 310 (Mo. 1963); *Howard* v. *Lightner,* 214 A.2d 474 (D.C. Ct. App. 1965).

---

sal endorsement, then that endorsement might not apply here for the reason mentioned in our text.

There is argument that paragraph 10 of the universal endorsement about "binders" might apply even if the rest did not, but this encounters the difficulty that it is not shown that any part of the endorsement received approval under G. L. c. 152, § 55, and that if Endorsement No. 2 is viewed as the placing of a policy for Massachusetts pursuant to a binder, it was stated to become effective some six months after the accident. Endorsement No. 3 came after expiration of the policy.

[11] The second paragraph of G. L. c. 152, § 55, as amended by St. 1934, c. 137, § 1, provides: "Any policy of insurance issued in violation of this section or of any other provision of this chapter shall nevertheless be valid and binding upon the company issuing it, and the rights, duties and obligations of the parties thereto shall be determined by this chapter and chapter one hundred and seventy five [Insurance]."

Compare the insurance law provision, G. L. c. 175, § 193, which states: "Any policy of insurance or any annuity or pure endowment contract issued in violation of any provision of this chapter shall be valid and binding upon the company issuing it, and the rights, duties and obligations of the parties thereto shall be determined by this chapter." In cases arising under § 193 there is no alternative available such as G. L. c. 152, § 66, and accordingly § 193 (or predecessor) calls for generous interpretation. See *Austin* v. *Dixie Fire Ins. Co.,* 232 Mass. 214 (1919); cf. *Hovhanesian* v. *New York Life Ins. Co.,* 310 Mass. 626 (1942); *Kingsley* v. *Spofford,* 298 Mass 469 (1937).

Since we hold that on the facts before us the employer had not gained rank as an insured under the Massachusetts workmen's compensation law, and Barrett's way was thus opened to the § 66 action, we need not rule on his alternative contention that there was an estoppel in pais to deny that Massachusetts coverage was lacking. The judge thought the insurer should be taken at its word in its repeated representations that there was no such coverage. He concluded that the insurer was estopped vis-à-vis Barrett. Barrett's reliance could be seen in his resort to the § 66 action. The judge, however, thought the insurer should not be considered to have been acting for Transformer Service, the defendant in the tort action, when it made the representations. On that assumption, a question — on which we do not intimate an opinion — might still be raised whether, in fairness, the estoppel should apply to Transformer Service to the extent of any duty the insurer might owe Transformer Service in case of a judgment against it under § 66 (see note 6 *supra*). This and other questions and complications of a theory based on estoppel we need not pursue here.[12] They do not arise in the straight § 66 action to which we hold Barrett is entitled.

3. *The tort action.* Barrett had no trouble establishing his claim in the § 66 action tried to a jury, and we need only decide the question that the parties speak of as one of "collateral estoppel."

In December, 1968, Barrett sued Foster Grant in the United States District Court for the District of New Hampshire charging it with negligence in the same accident. Besides answering Barrett with denials and other defenses, Foster Grant brought in Transformer Service as a third-

---

[12] It may be argued that if the estoppel is used, the measure of damages should correspond to the reliance, and that that would look only to the failure to receive compensation at Massachusetts rates up to the time (January, 1969) when the insurer admitted responsibility for Massachusetts compensation. On the other hand the employee could say the practical consequence has been to keep him out of major benefits over a period of years.

party defendant, claiming that if Foster Grant was held liable to Barrett, Transformer Service would be liable to Foster Grant. The alleged bases of Transformer Service's liability to Foster Grant were (according to the District Court's characterization of the third-party complaint):[13] reliance by Foster Grant on representations by Transformer Service as to the competence of its employees; express and implied warranty of such competence; express or implied agreement of indemnity. It does not appear that there were any further pleadings by which, as permitted by Fed. R. Civ. P. 14, Barrett might have asserted a direct claim against Transformer Service. The result of the trial was a judgment for Barrett against Foster Grant, and dismissal of the claim asserted by Foster Grant against Transformer Service. On appeal by Foster Grant from both decisions, the First Circuit Court of Appeals absolved Foster Grant of liability to Barrett holding, for reasons which need not be elaborated, that the applicable law was not that of New Hampshire (as the District Court had held) but rather Massachusetts law, and by that law the duty of Foster Grant, as a landowner, toward an employee of Transformer Service, as an independent contractor, was quite narrow.[14] The appeal of the dismissal of Foster Grant's claim against Transformer Service was held to be moot.[15]

We see no persuasive ground for holding that the amount of the judgment obtained by Barrett against Foster Grant in this Federal action should carry over and control in the action by Barrett against Transformer Service here under review. We do not think it can be said that Transformer Service was definitely ranged in opposition to any other party in the Federal action with regard to the amount of Barrett's damages, and so there should be no direct or collateral estoppel against it on that issue. See Restatement (Second) of Judgments § 68, Comments d and e (Tent. Draft No.

---

[13] See *Barrett* v. *Foster Grant Co.*, 321 F. Supp. 784, 797-798 (1970).

[14] 450 F.2d 1146, 1149 (1st Cir. 1971).

[15] 450 F.2d at 1154.

1, 1973). But, if that be incorrect, and Transformer Service is conceived to be implicated in some way in the finding of amount in the Federal action, a carry-over to the later action would still be properly denied because the approach taken by the Court of Appeals prevented appellate reexamination and correction of the finding. See *id.* at § 68, Comment o. We pass over the point that the later jury finding could have had the advantage of hindsight as to some of the elements of the damages claimed.

*Judgments affirmed.*